1   Thomas B. Walper (CA Bar No. 096667)
    Bernard A. Eskandari (CA Bar No. 244395)
2   M. Lance Jasper (CA Bar No. 244516)
    MUNGER, TOLLES & OLSON LLP
3   355 South Grand Avenue
    Thirty-Fifth Floor
4   Los Angeles, California 90071-1560
    Telephone:    (213) 452-5593
5   Facsimile:    (213) 687-3702
    Email:        thomas.walper@mto.com
6                 bernard.eskandari@mto.com
                  lance.jasper@mto.com
7
    Proposed *Pro Bono* Bankruptcy Counsel for Debtor and
8   Debtor-in-Possession

9

10                      **UNITED STATES BANKRUPTCY COURT**

11                      **CENTRAL DISTRICT OF CALIFORNIA**

12                          **LOS ANGELES DIVISION**

13
    In re                                   Case No. 2:10-bk-28586-TD
14
    **THE PASADENA PLAYHOUSE**              Chapter 11
15  **STATE THEATRE OF CALIFORNIA,**
    **INC.,**                               **SMALL BUSINESS CASE UNDER FRBP**
16                                          **1020**
                     Debtor and Debtor-in-
17                   Possession             **OMNIBUS DECLARATION OF STEPHEN**
                                            **EICH IN SUPPORT OF EMERGENCY**
18                                          **FIRST-DAY MOTIONS**

19                                          **Hearing**
                                            Date:    May 14, 2010
20                                          Time:    10:00 a.m.
                                            Place    Courtroom 1352
21                                                   255 East Temple Street
                                                     Los Angeles, California 90012
22

23

24

25

26

27

28

    10482574.1

1

**OMNIBUS DECLARATION OF STEPHEN EICH**

2

I, Stephen Eich, declare as follows:

3        1.        I am the Executive Director of The Pasadena Playhouse State Theater of

4    California, Inc., the above-captioned debtor and debtor in possession ("PPST" or the "Debtor").

5    In this capacity, I am generally familiar with the day-to-day operations, business and financial

6    affairs of the Debtor, and with much of PPST's history.

7        2.        Except as otherwise stated, all facts contained within this Declaration are based

8    upon personal knowledge (either my own or that gathered from others within the Debtor's

9    organization), my review of relevant documents, or my opinion based upon my experience

10    concerning the operations of the Debtor.  If called upon to testify, I would testify to the facts set

11    forth in this Declaration.

12

**I.**

13

**GENERAL BACKGROUND**

14    **A.        Introduction**

15        3.        PPST filed its bankruptcy petition and schedules in this case after struggling for

16    years against long-standing financial obligations.  Notwithstanding its difficult financial situation,

17    PPST and the Playhouse continue to enjoy substantial support from the community and from

18    donors who would like to see PPST reorganize and continue to put on shows at the historic

19    Playhouse.  Several donors in fact have pledged to provide an aggregate amount of approximately

20    $232,000 in post-petition donations to help defray the Debtor's operating expenses in bankruptcy

21    and to promote the Debtor's quick and successful reorganization.  PPST has also received

22    significant donations contingent on its successful emergence from bankruptcy.

23    **B.        The Debtor and The Pasadena Playhouse**

24        4.        PPST is a California nonprofit public benefit corporation.  PPST was formed in

25    1979 with the express purpose of maintaining and preserving the Pasadena Playhouse, a theater

26    complex located at 39 South El Molino Avenue, Pasadena, California, 91101 (the "Playhouse"),

27    and ensuring that the Playhouse is used for performing arts productions open to the public.  The

28

10482574.1

1  Playhouse was named to the National Register of Historic Places in 1974 and is a source of civic

2  pride for Pasadena and the greater Los Angeles area.

3      5.      Since 1996, PPST has operated the Playhouse on a not-for-profit basis.  In addition

4  to producing "main-stage" plays, PPST, among other things, serves the community through

5  partnerships with local schools and social-service organizations, providing workshops and

6  performances as a part of their regular curriculum.  In fulfilling its mission, PPST has historically

7  received approximately 60% of its necessary operational funding from the generous donations of

8  its benefactors and approximately 40% from ticket sales.

9  **C.      The Debtor's Corporate Structure and Management Team**

10     6.      PPST is overseen by a board of directors (the "Board").  Among other oversight

11  tasks, the Board is charged with the critical responsibility of selecting and retaining both the

12  Playhouse's artistic director and PPST's executive director.

13     7.      Sheldon Epps, a nationally renowned producer and director, joined PPST as

14  artistic director in 1997.  He oversees all artistic aspects of PPST's main-stage productions at the

15  Playhouse, including the selection of performances.  Mr. Epps is also a member of the Executive

16  Board of PPST and of the Society of Stage Directors and Choreographers.  Before joining PPST,

17  Mr. Epps was a co-founder of the off-Broadway theater The Production Company and directed

18  the Duke Ellington musical *Play On!* which received three Tony Award nominations.  Since

19  joining the Playhouse in 1997, Mr. Epps's directing credits have included *As Bees In Honey*

20  *Drown, Blue, Play On!, Les Liaisons Dangereuses, The Importance of Being Earnest, The Old*

21  *Settler, The Real Thing, On Borrowed Time, Mr. Rickey Calls a Meeting, Blues in the Night,* and

22  *Purlie,* a co-production with the Goodman Theatre.  Mr. Epps is also a two-time recipient of the

23  Theatre Communications Group/Pew Charitable Trust National Theatre Artists Residency Grant.

24     8.      In late 2008, PPST hired me as Executive Director.  I am an experienced manager

25  of theaters, having served as Managing Director of the Geffen Playhouse in Los Angeles for eight

26  years and Managing Director of the Steppenwolf Theater Company in Chicago for sixteen years.

27

28

10482574.1                                    - 2 -

1   **D.      The Debtor's Recent Financial History and Chapter 11 Filing**

2           9.      Since PPST took over operations of the Playhouse in 1996, it has achieved

3   significant artistic success, but has struggled financially as a result of uncollected legacy debts.

4   As such, PPST has been forced to rely on substantial charitable contributions to fund its

5   operations.

6           10.     At the same time, a substantial portion of PPST's operating budget has been

7   devoted to debt service, making it more difficult to raise money, as many charitable foundations

8   are unwilling to donate to a nonprofit with such high levels of indebtedness.  Prior to filing its

9   Petition, PPST attempted to secure a major donor by offering rights to the name of the Playhouse,

10  but was unsuccessful.

11          11.     The most recent Playhouse performance was a production of *Camelot*, which

12  closed on February 7, 2010.

13  **E.      The Debtor's Asset and Debt Structure**

14          12.     As of the Petition Date, the Debtor had approximately $2.3 million in obligations

15  held by approximately 3,000 creditors.  Approximately 2,600 of the Debtor's creditors are

16  households that purchased one or more season subscriptions to performances at the Playhouse.

17  PSST's greatest single liability arises out of unsecured obligations to Community Bank totaling

18  approximately $600,000 (the "Community Bank Loans").  The City of Pasadena has guaranteed

19  one of the Community Bank Loans.

20          13.     The economic crisis of late 2008 dealt a crushing blow to PPST as a severe and

21  immediate decline in donations left it in critical financial condition.  This precipitous drop in

22  revenues meant that PPST could neither meet its financial obligations nor plug the hole in its

23  balance sheet, which ultimately forced the nonprofit to succumb to the financial pressure that, in

24  substantial measure, it inherited from the previous, for-profit operator of the Playhouse.  Unable

25  to extricate itself from these financial difficulties, the Debtor filed for bankruptcy protection,

26  under chapter 11 of the Bankruptcy Code, on May 10, 2010.

27

28

10482574.1                                    - 3 -

## II.

## SPECIFIC FIRST DAY MOTIONS

**A.       Motion to Limit Notice**

14.     As set forth in the Creditor Matrix and the Debtor's Petition and Schedules filed May 10, 2010, the Debtor has approximately 3,000 creditors.

15.     Providing notice to all of the Debtor's creditors of every routine matter would impose a significant burden on the Debtor's limited resources and would reduce the Debtor's ability to successfully reorganize.

**B.       Utilities Motion**

16.     In connection with its daily operations, PPST uses electricity, gas, water, waste removal and other utility services from multiple utility companies through various different accounts.

17.     Those utility accounts have an average monthly aggregate cost of approximately $11,800.

18.     A true and correct list of the companies that provide these utility services to PPST is attached as Exhibit 1 to the concurrently filed Motion for Order (A) Prohibiting Emergency Utilities From Altering, Refusing, Or Discontinuing Service, And (B) Determining Adequate Assurance of Payment For Future Utility Services.

19.     Uninterrupted utility services are essential to PPST's ongoing business operations. Should a Utility refuse or discontinue service, even for a brief period, business operations could be disrupted.

20.     In the coming months, for example, PPST plans to use the Playhouse for performing-arts events produced by third parties—including an opera, a series of jazz concerts, and a high-school musical performance.  These events, if they occur, will generate revenue for PPST, and will require full utility service to the Playhouse.

21.     Historically, PPST has routinely paid its regular monthly utility obligations when due.  PPST anticipates that it will have adequate cash to meet all of its necessary post-petition

10482574.1                                        - 4 -

1  operating expenses on a current basis, including payments to the Utilities.  The Debtor has

2  specifically included in its budget amounts for payments to the Utilities.

3  **C.      Motion to Maintain Business Forms**

4        22.      The Debtor has numerous business forms, envelopes and letterhead that it uses to

5  operate its business, each of which includes the business logo of the Debtor.  If the Debtor were

6  required to replace all of those business forms it would present a significant cost to the estate and

7  interrupt the Debtor's operations.  The Debtor has suspended, and is in the process of closing, its

8  pre-bankruptcy bank accounts with Wells Fargo, N.A.

9  **D.      Motion for Order to Approve Use of Post-Petition Donations**

10        23.      Several donors (the "Donors") have pledged to provide an aggregate amount of

11  approximately $232,000 to help defray the Debtor's bankruptcy expenses and to promote the

12  Debtor's quick and successful reorganization (the "Pledges").

13        24.      The Donors have made these donations to bridge the operating expenses of PPST

14  to a rapid and successful reorganization.  Accordingly, the Donors have conditioned their pledges

15  on certain requirements and limitations on the use of the donations.  These include:

16        (a) making the donation only after the filing of a voluntary chapter 11 bankruptcy

17  petition by Debtor;

18        (b) permitting the Debtor to use the pledged amount "solely for purposes of paying

19  the costs and expenses that are incurred or assumed by PPST from and after the filing of the

20  Bankruptcy Petition, including, without limitation, to sustain the operations of PPST during the

21  bankruptcy process and to fund the future operations of PPST after its emergence;" and

22        (c) prohibiting the use of the donation "to pay debts incurred by PPST prior to the

23  filing of the" Debtor's bankruptcy, other than cure costs or amounts payable upon emergence

24  under a plan of reorganization.

25        25.      A true, correct and representative copy of one of the Pledges is attached to the

26  concurrently filed Motion for Order to Approve Use of Post-Petition Donations as Exhibit 1.

27

28        I declare under penalty of perjury under the laws of the United States of America

10482574.1                                    - 5 -

1   that the foregoing is true and correct to the best of my knowledge.  Executed this May 12, 2010,

2   at Los Angeles, California.

                                                            _____
                                                                         Stephen Eich