B25B (Official Form 25B) (12/08)

Thomas B. Walper (CA Bar No. 096667)
Bernard A. Eskandari (CA Bar No. 244395)
M. Lance Jasper (CA Bar No. 244516)
MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue
Thirty-Fifth Floor
Los Angeles, California 90071-1560
Telephone:      (213) 452-5593
Facsimile:      (213) 687-3702
Email:           thomas.walper@mto.com
                 bernard.eskandari@mto.com
                 lance.jasper@mto.com

Proposed *Pro Bono* Bankruptcy Counsel for
Debtor and Debtor-in-Possession

## UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re<br><br>THE PASADENA PLAYHOUSE STATE THEATRE OF CALIFORNIA, INC., a California nonprofit public benefit corporation,<br><br>          Debtor and Debtor-in-Possession. | Case No. 2:10-bk-28586-TD<br><br>Chapter 11<br><br>**SMALL BUSINESS CASE UNDER FRBP 1020**<br><br>**DISCLOSURE STATEMENT ON SECOND AMENDED PLAN OF REORGANIZATION**<br><br>**Hearing on Final Approval**<br>Date:   July 7, 2010<br>Time:  3:00 p.m.<br>Place: Courtroom 1345<br>       255 East Temple Street<br>       Los Angeles, California 90012 |

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ............................................................................................... 1

        A.      Purpose of This Document ................................................................. 1

        B.      Deadlines for Voting and Objecting; Date of Plan Confirmation Hearing ..................... 1

                1.      Time and Place of the Hearing to Finally Approve This Disclosure
                        Statement and Confirm the Plan ................................................... 1

                2.      Deadline For Voting to Accept or Reject the Plan ........................... 2

                3.      Deadline For Objecting to the Adequacy of Disclosure and Confirmation
                        of the Plan ....................................................................... 2

                4.      Identity of Person to Contact for More Information ......................... 2

        C.      Disclaimer ..................................................................................... 2

II.     BACKGROUND .............................................................................................. 3

        A.      Description and History of the Debtor's Business ............................. 3

        B.      Insiders of the Debtor .................................................................... 3

        C.      Management of the Debtor Before and During the Bankruptcy ........... 4

        D.      Events Leading to Chapter 11 Filing ............................................... 4

                1.      Genesis of Legacy Debts (1996-2001) .......................................... 4

                2.      Nonprofit Operation .............................................................. 5

        E.      Significant Events During the Bankruptcy Case ............................... 6

                1.      Commencement of the case and first day orders .............................. 6

                2.      Operations during bankruptcy .................................................... 6

                3.      Other events during bankruptcy .................................................. 6

        F.      Projected Recovery of Avoidable Transfers ...................................... 6

        G.      Claims Objections .......................................................................... 6

        H.      Current and Historical Financial Conditions .................................... 7

III.    SUMMARY OF THE PLAN OF REORGANIZATION AND TREATMENT OF
        CLAIMS AND EQUITY INTERESTS ................................................................. 7

        A.      What is the Purpose of the Plan of Reorganization? ......................... 7

        B.      Unclassified Claims ........................................................................ 7

                1.      Administrative Expenses .......................................................... 7

                2.      Priority Tax Claims ............................................................... 8

                3.      Priority Season Subscription Claims ........................................... 9

# TABLE OF CONTENTS
(continued)

**Page**

C.   Classes of Claims and Equity Interests ................................................................ 9

    1.   Classes of Secured Claims ........................................................................ 9

    2.   Classes of Priority Unsecured Claims .................................................. 10

    3.   Classes of General Unsecured Claims ................................................. 11

    4.   Equity Interest Holders ......................................................................... 12

D.   Means of Implementing the Plan ....................................................................... 12

    1.   Source of Payments ............................................................................... 12

    2.   Post-Confirmation Management .......................................................... 12

    3.   Operations after Emergence from Bankruptcy ................................. 13

        (i)    Operational Overview .................................................... 13

        (ii)   Production Activities ...................................................... 13

        (iii)  Staffing ............................................................................ 13

        (iv)   Strategic Fundraising ..................................................... 14

        (v)    Marketing and Community Relations .......................... 14

        (vi)   Executive Leadership and Reconstituted Board of Directors ............... 14

        (vii)  Budgetary Matters ......................................................... 14

E.   Risk Factors ......................................................................................................... 15

    1.   Risks that the Debtor Will Have Insufficient Cash for the Plan to Become Effective ................................................................................... 15

    2.   Bankruptcy Risks .................................................................................. 15

    3.   Business Risks ........................................................................................ 15

        (i)    Industry Conditions and Competition ......................... 16

        (ii)   Operating ......................................................................... 16

F.   Executory Contracts and Unexpired Leases ..................................................... 16

G.   Tax Consequences of Plan ................................................................................. 17

    1.   Federal Income Tax Consequences to the Creditors ....................... 17

    2.   Tax Consequences to the Debtor ........................................................ 18

IV.   CONFIRMATION REQUIREMENTS AND PROCEDURES ............................. 18

A.   Who May Vote or Object .................................................................................... 18

    1.   What Is an Allowed Claim? .................................................................. 18

# TABLE OF CONTENTS
(continued)

**Page**

| | | | |
|---|---|---|---|
| | 2. | What Is an Impaired Claim or Impaired Equity Interest? | 19 |
| | 3. | Who is Not Entitled to Vote | 19 |
| | 4. | Who Can Vote in More Than One Class | 19 |
| B. | | Votes Necessary to Confirm the Plan | 19 |
| | 1. | Votes Necessary for a Class to Accept the Plan | 19 |
| | 2. | Treatment of Nonaccepting Classes | 19 |
| C. | | Liquidation Analysis | 20 |
| D. | | Feasibility | 20 |
| | 1. | Ability to Initially Fund Plan | 20 |
| | 2. | Ability to Make Future Plan Payments And Operate Without Further Reorganization | 20 |
| V. | | EFFECT OF CONFIRMATION OF PLAN | 21 |
| A. | | Discharge Of Debtor | 21 |
| B. | | Modification of Plan | 21 |
| C. | | Final Decree | 21 |
| VI. | | OTHER PLAN PROVISIONS | 21 |
| A. | | Definitions and Rules of Construction | 21 |
| B. | | Retention of Jurisdiction | 21 |
| C. | | Exculpation | 21 |
| D. | | Effective Date of Plan | 22 |
| E. | | Severability | 22 |
| F. | | Binding Effect | 22 |
| G. | | Controlling Effect | 23 |

## I.    INTRODUCTION

This is the disclosure statement ("Disclosure Statement") in the small business chapter 11 case of The Pasadena Playhouse State Theatre of California, Inc., a nonprofit public benefit corporation ("Pasadena Playhouse," "Playhouse," or "Debtor").  This Disclosure Statement contains information about the Debtor and describes the Second Amended Plan of Reorganization ("Plan"), filed on May 25, 2010, a full copy of which is attached to this Disclosure Statement as Exhibit A.  *Your rights may be affected.  You should read the Plan and this Disclosure Statement carefully and discuss them with your attorney.  If you do not have an attorney, you may wish to consult one.*

The proposed distributions under the Plan are discussed at pages 7-12 of this Disclosure Statement.

### A.    Purpose of This Document

This Disclosure Statement describes:

- The Debtor and significant events during the bankruptcy case;

- How the Plan proposes to treat claims of the type you hold (*i.e.*, what you will receive on your claim if the plan is confirmed);

- Who can vote on or object to the Plan;

- What factors the Bankruptcy Court ("Court") will consider when deciding whether to confirm the Plan;

- Why the Pasadena Playhouse believes the Plan is feasible, and how the treatment of your claim under the Plan compares to what you would receive on your claim in liquidation; and

- The effect of confirmation of the Plan.

Be sure to read the Plan as well as this Disclosure Statement.  This Disclosure Statement describes the Plan, but it is the Plan itself that will, if confirmed, establish your rights.

### B.    Deadlines for Voting and Objecting; Date of Plan Confirmation Hearing

The Court has not yet confirmed the Plan described in this Disclosure Statement.  This section describes the procedures pursuant to which the Plan will or will not be confirmed.

1.    *Time and Place of the Hearing to Finally Approve This Disclosure Statement and Confirm the Plan*

The hearing at which the Court will determine whether to finally approve this Disclosure Statement and confirm the Plan will take place on July 7, 2010, at 3:00 pm, in Courtroom 1345, at the United States Bankruptcy Court, Central District of California, 255 East Temple Street, Los Angeles, CA 90012.

2.      *Deadline For Voting to Accept or Reject the Plan*

If you are entitled to vote to accept or reject the plan, vote on the enclosed ballot and return the ballot in the enclosed envelope to Munger, Tolles & Olson LLP, Attn: Bernard Eskandari, 355 South Grand Avenue, 35th Floor, Los Angeles, CA 90071.  See section IV.A. below for a discussion of voting eligibility requirements.

Your ballot must be received by June 18, 2010 or it will not be counted, unless otherwise agreed by the Debtor or by order of the Court.

3.      *Deadline For Objecting to the Adequacy of Disclosure and Confirmation of the Plan*

Objections to this Disclosure Statement or to the confirmation of the Plan must be filed with the Court and served upon the following by June 28, 2010:

(i)      the Debtor and Debtor's counsel;

(ii)     the Office of the United States Trustee;

(iii)    the list of creditors holding the 20 largest unsecured, non-priority claims filed by the Debtor in accordance with Bankruptcy Rule 1007(d);

(iv)     the City of Pasadena; and

(v)      parties that have filed with the Court requests for notice of all matters in accordance with Bankruptcy Rule 2002(i).

4.      *Identity of Person to Contact for More Information*

If you want additional information about the Plan, you should contact Munger, Tolles & Olson LLP, Attn: Bernard Eskandari, 355 South Grand Avenue, 35th Floor, Los Angeles, CA 90071, 213-452-5593.

**C.     Disclaimer**

***The Court has conditionally approved this Disclosure Statement as containing adequate information to enable parties affected by the Plan to make an informed judgment about its terms. The Court has not yet determined whether the Plan meets the legal requirements for confirmation, and the fact that the Court has approved this Disclosure Statement does not constitute an endorsement of the Plan by the Court, or a recommendation that it be accepted.  The Court's approval of this Disclosure Statement is subject to final approval at the hearing on confirmation of the Plan.***

## II.     BACKGROUND

**A.     Description and History of the Debtor's Business**

The Pasadena Playhouse is a California nonprofit public benefit corporation.  For more than 90 years, it has been both a source of civic pride for the community of Pasadena and the greater Los

Angeles area, as well as a cornerstone of the region's performing arts culture. Since 1985, the Debtor has been responsible for maintaining the Playhouse theater and, since 1996, the Debtor has operated the Playhouse theater on a nonprofit basis, pursuing its mission to present live community theater productions to the public.

### B.    Insiders of the Debtor

| Insider | Relationship to the Debtor | Compensation Prior to Bankruptcy Filing | Expected Compensation During Bankruptcy |
|---|---|---|---|
| Eich, Stephen | Executive Director | $160,000 per year | $3,076.92 per week |
| Epps, Sheldon | Artistic Director | $220,000 per year | 0 |
| Engemann, Michele | Board Member (Chair) | 0 | 0 |
| Grether-Marion, Sheila | Board Member (Vice Chair) | 0 | 0 |
| DiCristofaro, David | Board Member (Treasurer) | 0 | 0 |
| Boyd-Griffey, Linda | Board Member (Secretary) | 0 | 0 |
| Bennett, Cynthia | Board Member | 0 | 0 |
| Burnett, Carol | Board Member | 0 | 0 |
| Ebright, Peggy | Board Member | 0 | 0 |
| Furiga, Bridget | Board Member | 0 | 0 |
| Greenblatt, Bob | Board Member | 0 | 0 |
| Hurren, Colin | Board Member | 0 | 0 |
| Krell, Catherine | Board Member | 0 | 0 |
| Leavy, Donna | Board Member | 0 | 0 |
| Lowrey, D. Tad | Board Member | 0 | 0 |
| Muir, Sharon | Board Member | 0 | 0 |
| Philibosian, Diane | Board Member | 0 | 0 |
| Ramirez, Abel | Board Member | 0 | 0 |
| Roat, Kathy | Board Member | 0 | 0 |
| Roncelli, Bingo | Board Member | 0 | 0 |
| Sedenquist, Margaret | Board Member | 0 | 0 |
| Spector, Earlyn | Board Member | 0 | 0 |
| Stahler, Elliot | Board Member | 0 | 0 |
| Stangeland, Lilah | Board Member | 0 | 0 |
| Wilcott, Scott | Board Member | 0 | 0 |
| Williamson, Martha | Board Member | 0 | 0 |

### C.    Management of the Debtor Before and During the Bankruptcy

During the two years prior to the date on which the bankruptcy petition was filed, the officers, directors, managers or other persons in control of the Debtor (collectively the "Managers") were those individuals listed above in section II.B of this Disclosure Statement, in addition to Betty Ann Brooks, David Davis, Jim Fielding, Robert Goldberg, Ann Hamilton, George Handtman III, Ralph

Hirschmann, Frank Kleeman, Albert Lowe, Dennis Lowe, Rao Makineni, Kerry McCluggage, Gregory Stone, James Watterson, and Lyla White, each former Board Members; and Ken Novice, the former Executive Director.

The Managers of the Debtor during the Debtor's chapter 11 case have been those individuals listed above in section II.B of this Disclosure Statement.

After the Effective Date of the order confirming the Plan, the directors, officers, and voting trustees of the Debtor, any affiliate of the Debtor participating in a joint Plan with the Debtor, or successor of the Debtor under the Plan (collectively the "Post Confirmation Managers"), will be those individuals listed above in section II.B of this Disclosure Statement. The responsibilities and compensation of these Post Confirmation Managers are described in section III.D.2 of this Disclosure Statement.

## D.       Events Leading to Chapter 11 Filing

The cultural institution now known as the Pasadena Playhouse began in 1917, when the Community Playhouse Association was established to produce live theater in Pasadena. In 1925, the group moved its productions to a newly constructed and architecturally significant theater located at 39 South El Molino Avenue, the building that has been known as the home of the Pasadena Playhouse ever since. In 1937, the organization was incorporated as a not-for-profit entity and in that same year, based upon an unprecedented production of Shakespearian plays, the California legislature bestowed on the Playhouse the honorary title of the State Theatre of California. The Pasadena Playhouse Association owned the Playhouse theater and the adjoining buildings and used them for both live theater productions and to operate a collegiate-level school of theater and performing arts. During the period between 1925 and 1969, the Pasadena Playhouse Association operated as a conservancy of sorts: both producing critically acclaimed live theater and training actors, many of them enrolled by the major motion picture studios. The Playhouse theater has trained some of the world's most renowned and talented performers, including Dustin Hoffman, Raymond Burr, Charles Bronson, and Gene Hackman.

Notwithstanding the long history and historic significance of the Playhouse, the Debtor has been compelled to seek bankruptcy protection as a direct consequence of the recent and severe economic downturn. Beginning in the fall of 2008, the Debtor suffered a dramatic decrease in charitable donations, which are its lifeblood. This precipitous drop in revenues rendered the Debtor unable to meet either its current debts or the legacy financial obligations it inherited from the previous, for-profit operator of the Playhouse theater.

### 1.       Genesis of Legacy Debts (1996-2001)

The Debtor's present financial difficulties arise in part from the legacy of debts foisted upon it by the former owner of the Playhouse theater, Pasadena Playhouse Associates ("PPA"), and the former manager of the Playhouse theater, Theatre Corporation of America ("TCA"). Each of PPA and TCA filed bankruptcies in the late 1990's. In March 1995, TCA filed a voluntary chapter 11 in the Central District of California. *See In re Theatre Corp. of Am.* (Case No. 95-bk-16410-TD). In October 1996, the Bankruptcy Court confirmed TCA's plan of reorganization. Pursuant to that plan, TCA agreed to sell to the Debtor substantially all of the Playhouse assets, including the Playhouse theater and the adjoining office tower. In exchange, the Debtor agreed to satisfy the TCA debts—which had grown to

5

approximately $3.2 million—and pay $5 million for the real estate, which the Debtor was to raise through a bond financing.  However, in the fall of 1998, prior to the consummation of the transaction, TCA terminated the acquisition agreement and PPA, the owner of the real estate, itself filed for bankruptcy.  *See In re Pasadena Playhouse Assocs.* (Case No. 98-bk-45602-TD).  As a consequence, the Debtor reported in its 1998 financial statements a provision for uncollectable receivables from TCA in the amount of $3.2 million.  This charge resulted in a decrease in the Debtor's net assets from more than $400,000 in 1997 to negative $3,074,122 at the end of 1998.

This uncollectable debt has been an insurmountable hurdle to a balanced budget and a sound financial footing.  The Debtor sought to recover the sums owed by TCA in the PPA bankruptcy case and asserted claims against TCA.  *See Pasadena Playhouse State Theatre, Inc. v. Pasadena Playhouse Assocs., Ltd.*, 99-ap-3291 (TD).  The suits were complicated, however, by allegations of improper accounting for the movement of funds—including funds from loans secured by the Debtor's assets—between the for-profit entities and the nonprofit Debtor during the period that the entities were jointly under common control of the owner of PPA.  The suits were ultimately settled in January 2001 after the Mayor of Pasadena brokered an agreement.  On November 14, 2001, the Bankruptcy Court administering the estate of PPA authorized the sale of the Playhouse theater and adjoining buildings to the Varon Family Trust for $3.1 million free and clear of all liens, claims, and interests but subject to the existing lease of the Playhouse theater (but not the adjoining buildings) to the City of Pasadena and the existing sublease from the City of Pasadena to the Debtor.

> 2.    *Nonprofit Operation*

Since assuming operational control of the Playhouse from TCA, the Debtor has achieved significant artistic success, but it has and continues to be financially crippled by its dependence in great part on charitable contributions to underwrite productions and retire its legacy debt.  Between 1996 and 2008, the Debtor's balance sheet continued to reflect the negative consequences of the uncollected debts that trace to TCA.  During this period, not only was a substantial portion of the Debtor's operating budget used for debt-service, but the debt frustrated the Debtor's fundraising efforts as charitable foundations, and many individuals, declined to donate to a nonprofit entity with significant levels of indebtedness.  Finally, the economic crisis of late 2008 dealt a crushing blow to the Debtor as a severe and immediate decline in donations left it in critical financial condition.

In late 2008, after a nationwide search, the Debtor's Board of Directors hired the current executive director, Stephen Eich.  Eich is an experienced manager of theaters, having served as executive director of the Geffen Playhouse in Los Angeles for eight years and as executive director of the Steppenwolf Theater Company in Chicago for sixteen years.

When Eich took over management of the Debtor in July 2009, the entity had more than $3 million in outstanding debt and obligations, with literally no cash on hand.  The combined impact of the Debtor's significant debt levels and the sharp decrease in charitable contributions converged in late 2009.  By February 2010, the Debtor was forced to lay off substantially all of its personnel and seek to reorganize.

**E.    Significant Events During the Bankruptcy Case**

> 1.    *Commencement of the case and first day orders*

The case has been filed as a Small Business Case under Rule 1020 of the Federal Rules of Bankruptcy Procedure. Following commencement of the case, the Debtor sought and obtained approval of certain emergency motions that limited notice of certain matters, ensured continued service by utilities, approved the continued use of the Debtor's prepetition business forms, and approved terms for the use of postpetition donations that require that the donations be used for postpetition operations and reorganization of the Debtor. In addition, the Debtor has sought to employ Munger, Tolles & Olson LLP as *pro bono* bankruptcy counsel to the Debtor; this application is pending Court approval.

### 2.    *Operations during bankruptcy*

The Debtor commenced bankruptcy with miscellaneous secured claims of less than $150,000, unliquidated priority claims of approximately $1.2 million, consisting primarily of Season Subscription Claims, and non-priority unsecured claims of approximately $1.1 million. The Debtor's prepetition assets consist primarily of cash, of which approximately $90,000 is subject to restrictions placed on its use under the terms upon which it was donated; a sublease with the City of Pasadena under which the Debtor leases the Playhouse theater; miscellaneous personal and intellectual property; and earmarked donations to be used for the Debtor's postpetition operations.

During the bankruptcy case, the Debtor is operating with only a core staff consisting of its existing artistic director, executive director, financial controller, and administrative assistant. To fund its operations, the Debtor obtained prepetition, written commitments from board members and other generous donors of approximately $232,000, which will be paid postpetition to the Debtor and used by the Debtor subject to the terms approved by the Court for the use of the donations. In addition, the Debtor will seek to supplement these donations with income from the use of the Playhouse theater by third parties, although such income is expected to be nominal. The Debtor also expects to continue to receive a few thousand dollars each month in royalties relating to a Debtor-produced play that is currently being staged at another performance venue.

In order to assist the Debtor in conserving cash, Sheldon Epps, the Debtor's artistic director, has agreed to defer a significant portion of his salary while the Debtor remains in chapter 11.

### 3.    *Other events during bankruptcy*

The Debtor has not sold any assets or commenced any adversary proceedings.

### F.    **Projected Recovery of Avoidable Transfers**

The Debtor does not intend to pursue preference, fraudulent conveyance, or other avoidance actions.

### G.    **Claims Objections**

Except to the extent that a claim is already allowed pursuant to a final non-appealable order, the Debtor reserves the right to object to claims. Therefore, even if your claim is allowed for voting purposes, you may not be entitled to a distribution if an objection to your claim is later upheld. The procedures for resolving disputed claims are set forth in Article V of the Plan.

### H.    **Current and Historical Financial Conditions**

**B25B (Official Form 25B) (12/08) – Cont.**                                        7

The identity and fair market value of the estate's assets are listed in Exhibit B.

The Debtor's most recent financial statements issued before bankruptcy, each of which was filed with the Court, are set forth in Exhibit C.

If applicable, the most recent postpetition operating report filed since the commencement of the Debtor's bankruptcy case is set forth in Exhibit D.

## III.    SUMMARY OF THE PLAN OF REORGANIZATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS

### A.    What is the Purpose of the Plan of Reorganization?

As required by the Code, the Plan places claims in various classes and describes the treatment each class will receive.  The Plan also states whether each class of claims is impaired or unimpaired.  If the Plan is confirmed, your recovery will be limited to the treatment provided by the Plan.

### B.    Unclassified Claims

Certain types of claims are automatically entitled to specific treatment under the Code.  They are not considered impaired, and holders of such claims do not vote on the Plan.  They may, however, object if, in their view, their treatment under the Plan does not comply with that required by the Code. As such, the Plan Proponent has *not* placed the following claims in any class:

#### 1.    *Administrative Expenses*

Administrative expenses are costs or expenses of administering the Debtor's chapter 11 case, which are allowed under § 507(a)(2) of the Code.  Administrative expenses also include the value of any goods sold to the Debtor in the ordinary course of business and received within 20 days before the date of the bankruptcy petition.  The Code requires that all administrative expenses be paid on the Effective Date of the Plan, unless a particular claimant agrees to a different treatment.

The following chart lists the Debtor's estimated administrative expenses, and their proposed treatment under the Plan:

10718158.3

B25B (Official Form 25B) (12/08) – Cont.                                                                          8

| Type | Estimated Amount Owed | Proposed Treatment |
|---|---|---|
| Expenses Arising in the Ordinary Course of Business After the Petition Date | Less than $150,000 | Paid in full on the Effective Date of the Plan or according to terms of obligation if later. |
| The Value of Goods Received in the Ordinary Course of Business Within 20 Days Before the Petition Date | None | N/A |
| Professional Fees and Expenses, as Approved by the Court | $10,000 or less in expenses (Professional Services provided *pro bono*) | Paid in full on the Effective Date of the Plan or according to the terms of an order of the Court. |
| Clerk's Office Fees | Less than $3,000 | Paid in full on the Effective Date of the Plan. |
| Expenses to Administer the Estate and cure Payments for Executory Contracts | Less than $100,000 | Paid in full on the Effective Date of the Plan or according to separate written agreement. |
| Office of the U.S. Trustee Fees | Less than $3,000 | Paid in full on the Effective Date of the Plan. |
| TOTAL | Less than $266,000 | |

        2.      *Priority Tax Claims*

        Priority tax claims are unsecured income, employment, and other taxes described by §
507(a)(8) of the Code.  Unless the holder of a § 507(a)(8) priority tax claim agrees otherwise, it must
receive the present value of such claim, in regular installments paid over a period not exceeding 5
years from the order of relief.

        The following chart lists the Debtor's estimated § 507(a)(8) priority tax claims and their
proposed treatment under the Plan:

| Description (name and type of tax) | Estimated Amount Owed | Date of Assessment | Treatment |
|---|---|---|---|
| State Board of Equalization | $800.00 | First Quarter, 2010 | Paid in full on the Effective Date of the Plan. |

        3.      *Priority Season Subscription Claims*

Each holder of a claim arising from the purchase of a Season Subscription shall have its rights honored through the receipt of tickets over time to theatrical performances pursuant to the terms of the Season Subscription.  The terms of the Season Subscription provide, among other things, that the tickets are non-refundable and that the performances, dates, and artists are subject to change.  Because the Debtor will honor the Season Subscription Claims in full over time, the holders of Season Subscription Claims do not qualify as holders of claims entitled to priority under § 507(a)(7).  The Debtor has provided the holders of Season Subscription Claims the opportunity to elect classification under Class 4(a) or (b) below.

### C.     Classes of Claims and Equity Interests

The following are the classes set forth in the Plan, and the proposed treatment that each will receive under the Plan:

### *1.     Classes of Secured Claims*

Allowed Secured Claims are claims secured by property of the Debtor's bankruptcy estate (or that are subject to setoff) to the extent allowed as secured claims under § 506 of the Code.  If the value of the collateral or setoffs securing the creditor's claim is less than the amount of the creditor's allowed claim, the deficiency will be classified as a general unsecured claim.

The following chart lists all classes containing the secured prepetition claims against the Debtor and their proposed treatment under the Plan:

B25B (Official Form 25B) (12/08) – Cont.                                                    10

| Class # | Description | Insider? (Yes or No) | Impairment | Treatment |
|---------|-------------|----------------------|------------|-----------|
| 1 and 2 | *Secured claims of*: <br><br>CIT Tech. Leasing (aka Blue Street Capital) claim of approximately $26,000 secured by telephone equipment <br><br>Hasler Financial Services claim of approximately $4,000 secured by a postage machine <br><br>Wells Fargo Leasing claim of approximately $51,000 secured by digital copiers and printers <br><br>Wells Fargo Merchant Services claim of an unliquidated amount secured by cash on deposit in a segregated merchant account | No | Class 1 is unimpaired <br><br><br><br> Class 2 is impaired | Each holder of a claim in Class 1 shall receive a return of the collateral securing the claim or the holder's rights shall otherwise not be altered by the Plan. <br><br>Each holder of a claim in Class 2 shall receive a newly negotiated loan or lease agreement that is agreed to by the holder of the secured claim and which shall be filed with the Court within fifteen days of the date first set for the confirmation hearing. |

    2.    *Classes of Priority Unsecured Claims*

        Certain priority claims that are referred to in §§ 507(a)(1), (4), (5), (6), and (7) of the Code, other than Season Subscription Claims for which holders that do not elect treatment in Class 4(a) or 4(b) below, are required to be placed in classes.  The Code requires that each holder of such a claim receive cash on the Effective Date of the Plan equal to the allowed amount of such claim.  However, a class of holders of such claims may vote to accept different treatment.

        The following chart lists all classes containing claims under §§ 507(a)(1), (4), (5), (6), and (a)(7) of the Code, other than Season Subscription Claims for which the holders do not elect treatment in Class 4(a) or 4(b) below, and their proposed treatment under the Plan:

**B25B (Official Form 25B) (12/08) – Cont.**                                                          11

| Class # | Description | Impairment | Treatment |
|---------|-------------|------------|-----------|
| 3 | Priority unsecured claims pursuant to §§ 507(a)(1), (4), (5), or (6)<br><br>Total amt of claims = Less than $4,312.50 | Unimpaired | Paid in full on the Effective Date of the Plan. |
| 4(a) | Priority unsecured claims pursuant to § 507(a)(7) of holders of Season Subscriptions that elect Class 4(a) convenience treatment<br><br>Total amt of claims = N/A | Impaired | Each holder of a Season Subscription that entitles the holder to a ticket to three or more performances at the Pasadena Playhouse that elects treatment under Class 4(a) shall, on the Effective Date, receive, in full and complete satisfaction of the holder's Season Subscription Claim, one ticket to each of the next two performances at the Pasadena Playhouse for each Season Subscription Claim. |
| 4(b) | Priority unsecured claims pursuant to § 507(a)(7) of holders of Season Subscriptions that elect Class 4(b) convenience treatment<br><br>Total amt of claims = N/A | Impaired | Each holder of a Season Subscription Claim that elects treatment under Class 4(b) shall, on the Effective Date, be deemed to contribute the value of the Season Subscription Claim to the reorganized Debtor and will receive a letter acknowledging that contribution. |

　　　　　　　　*3.    Classes of General Unsecured Claims*

　　　　General unsecured claims are not secured by property of the estate and are not entitled to priority under § 507(a) of the Code.

　　　　The following chart identifies the Plan's proposed treatment of Classes 5 and 6, which contain general unsecured claims against the Debtor:

B25B (Official Form 25B) (12/08) – Cont.                                                              12

| Class # | Description | Impairment | Treatment |
|---------|-------------|------------|-----------|
| 5 | Pasadena Sublease Class | Impaired | On the Effective Date, the Pasadena Sublease shall commence on the terms set forth in an agreement that shall be filed within fifteen days of the date first set for the confirmation hearing. In the event the Court determines that the treatment of the Class 5 Claim is not consistent with the Bankruptcy Code or the holder of the Class 5 Claim does not vote to accept its treatment under Class 5 of the Plan, the Debtor shall assume the Pasadena Sublease in accordance with the Plan. |
| 6 | General Unsecured Class | Impaired | Holders of claims in Class 6 are not entitled to any distribution under the Plan. |

        *4.*      *Equity Interest Holders*

The Debtor is a nonprofit public benefit corporation and does not have any equity holders.

**D.**    **Means of Implementing the Plan**

        *1.*      *Source of Payments*

Payments and distributions under the Plan will be funded by the following:

All assets of the Debtor shall revest in the reorganized Debtor on the Effective Date.  As more fully described below, the Debtor has obtained commitments in significant amounts for post-emergence operations that are sufficient to underwrite the operations of the reorganized Debtor.

There are prepetition pledges reflected on the Debtor's books and records.  The Debtor believes that these pledges are either uncollectable or are subject to restrictions that preclude the Debtor from using any collected amounts in the Debtor's ongoing operations.  Accordingly, the Debtor has not incorporated these pledges in its post-emergence business plan.

        *2.*      *Post-Confirmation Management*

The Post-Confirmation Managers of the Debtor, and their compensation, shall be as follows:

| Name | Insider (yes or no)? | Position | Compensation |
|------|----------------------|----------|--------------|
| Stephen Eich | Yes | Executive Director | $160,000 per year |
| Sheldon Epps | Yes | Artistic Director | $220,000 per year |

10718158.3

The Debtor will file amended articles and bylaws with the Court within fifteen days of the first date set for hearing on confirmation of the Plan.

### 3.    *Operations after Emergence from Bankruptcy*

#### (i)    Operational Overview

Upon emergence, the reorganized Debtor will strategically improve its infrastructure, resume production activities, strengthen its leadership, and rebuild community relationships.  The Debtor will return to full operations in fiscally prudent, incremental steps.  The Debtor's past financial difficulties based upon legacy liabilities constrained its ability to prepare and implement a comprehensive financial plan, often forcing it to operate in a reactionary manner as financial issues arose.  The fresh start offered by the Debtor's bankruptcy will allow the reorganized Debtor to operate proactively in the long-term interests of the Debtor and the community.

A copy of the Debtor's projections of cash flow and earnings for post-confirmation periods is attached as Exhibit G.

#### (ii)    Production Activities

Consistent with its mission of presenting live community theater productions to the public, the reorganized Debtor will resume production activities at the Playhouse as soon as reasonably practicable after emergence.  Production will resume at a pace and in a manner that is supported by the reorganized Debtor's financial resources.  The Debtor expects that its initial theatrical productions will be collaborative efforts with third parties.  Although such collaborative productions will likely require the Debtor to share ticket revenue with third parties, they also will expose the Debtor to less financial risk because a significant portion of the costs of such collaborative productions will be borne by third parties.  The Debtor has budgeted a total of $300,000 for production expenses related to these collaborative productions for the initial six months after emergence.  The actual amount of these production expenses will not exceed the budgeted amount.  The actual number of such collaborative productions that will be performed remains unknown.

The Debtor plans to stage two full productions during the second six months after emergence. The Debtor has also budgeted $300,000 for each of these two productions, which is consistent with the Debtor's historical production costs.  The actual production costs will depend on the productions but is not expected to exceed the budget projections.  The reorganized Debtor will resume a traditional production schedule when its resources and the economy allow it to do so.

#### (iii)    Staffing

The Debtor will emerge from bankruptcy with its existing core staff of an artistic director, executive director, office manager, and administrator.  After emergence, the Debtor will require additional staff, including box-office staff, maintenance staff, additional administrative staff, and a production manager.  As part of its goal of improving its infrastructure, improving its fundraising capability, and rebuilding community relations, the Debtor also expects to hire a full-time marketing director, a full-time development director, and related support staff.  The cost of such additional staff is included in the Debtor's post-emergence budget.

#### (iv)    Strategic Fundraising

Historically, the Debtor has relied on donations to fund between 25% to 30% of its annual expenditures.  During the past three years, the Debtor has been able to raise, on average, between $2,000,000 to $3,000,000 per year in donations to cover its operating expenses.  The Debtor has been able to raise such donations, primarily from generous donors within the community.  The Debtor believes that, by hiring a professional development director, it can embark on a strategic plan to increase its funding base and re-establish itself in the foundation community.  The fresh start from bankruptcy will assist in its fundraising efforts and in rebuilding relationships.

(v)     <u>Marketing and Community Relations</u>

Key to the future of the Debtor is rebuilding and expanding its subscription base.  After emergence, the reorganized Debtor will engage in programmatic marketing for specific plays and also institutional marketing to reinvigorate public enthusiasm about the important role in the community.  It will also engage in education and outreach programming in the community in order to build an audience of the future.

(vi)    <u>Executive Leadership and Reconstituted Board of Directors</u>

Sheldon Epps, the Debtor's artistic director for more than ten years, and Stephen Eich, executive director since July 2009, will lead the reorganized Debtor after its emergence from bankruptcy.  As part of the reorganization process, the Debtor will revise its articles and bylaws, recruit new and energized board members, and evaluate board responsibilities.

(vii)   <u>Budgetary Matters</u>

The Debtor has Budgeted approximately $2,878,000 in expenses for the initial one-year period after emergence.  This amount includes the cost of the additional staff and the production expenses discussed above.  This amount also includes one-time expenses (including Mr. Epps' deferred salary and contractual assumption expenses) to be paid in connection with emergence.

The Debtor's budget projects that approximately $2,100,000 of the operating expense during the initial year after emergence will be funded from donations.  The Debtor has commitments from generous donors for approximately $1,700,000 (of which approximately $1,500,000 is from donors who have not previously given to the Playhouse) to support the reorganized Debtor's operations after emergence.  Because the Debtor has historically been able to raise at least $2,000,000 per year in donations, the Debtor's board and management are confident that the reorganized Debtor will be able to raise from its existing donor base additional amounts, if necessary, to support the reorganized Debtor's operations after emergence.

The Debtor's budget also projects over $700,000 in operating income during its initial year after emergence.  This operating income is composed primarily of a combination of (i) ticket sales from the collaborative productions that the Debtor expects to stage initially, (ii) ticket sales from the two Playhouse-produced plays that the Debtor expects to stage in the second half of the initial year after emergence, (iii) a limited amount of royalty income from third-party staging of past Playhouse-produced plays, and (iv) concession sales and other miscellaneous income.  In estimating operating income, the Debtor employed conservative assumptions, using as a baseline the revenues that the Debtor had received in the past from an average production of average length and applying an appropriate discount to such revenues.

**B25B (Official Form 25B) (12/08) – Cont.**                                                                15

To the extent that donations or operating income are lower than projected, the Debtor expects to delay, scale down, or otherwise adjust its activities appropriately.  Conversely, higher than projected donations or operating income would permit the Debtor to build up cash reserves or to resume production activities and hire staff at a faster rate, or expanded level, than projected.

### E.    Risk Factors

The proposed Plan has the following risks:

Holders of impaired claims should read and consider carefully the factors set forth below, as well as other information set forth in this Disclosure Statement and the documents delivered together with and/or incorporated by reference to this document, prior to voting to accept or reject the Plan.

>    *1.    Risks that the Debtor Will Have Insufficient Cash for the Plan to Become Effective*

The Plan cannot be confirmed by the Bankruptcy Court unless the Debtor has sufficient funds by the Effective Date to pay its cash obligations to allowed administrative expenses and priority tax claims unless particular holders of such claims agree to deferred payment.  The Debtor believes that it will have sufficient cash to satisfy all such claims at the time of confirmation.

>    *2.    Bankruptcy Risks*

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.  The Debtor believes that the classification of claims under the Plan complies with the requirements set forth in the Bankruptcy Code.  However, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

Even if all classes of claims that are entitled to vote accept the Plan, the Plan might not be confirmed by the Bankruptcy Court.  Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and requires, among other things, that the confirmation of a plan is not likely to be followed by the liquidation or the need for further financial reorganization, and that the value of distributions to dissenting creditors and equity security holders not be less than the value of distributions such creditors and equity security holders would receive if the Debtor were liquidated under chapter 7 of the Bankruptcy Code.  The Debtor believes that the Plan satisfies all the requirements for confirmation of a plan and that the Bankruptcy Court will also conclude that the requirements for confirmation of the Plan have been satisfied.

>    *3.    Business Risks*

The Debtor believes that the Plan is based on a reasonable and attainable business plan that provides the Debtor the ability to meet its obligations under the Plan.  There are events, however, that could occur and risks associated with the Debtor's reorganization that would hinder the reorganized Debtor's ability to meet its Plan obligations.  For example, the Debtor's ability to successfully implement the Plan will be compromised if it is unable to raise sufficient donations or rebuild and expand its subscription base.  Moreover, the successful implementation of the Reorganized Debtor's business plan is dependent on the interaction of many other variables, including the reorganized Debtor's ability to retain its executive and artistic directors, its ability to hire a development officer

and implement a development plan, the effects of changing conditions in the theatrical and nonprofit community, the effects of general economic trends influencing consumers' discretionary expenditures, and the reorganized Debtor's marketing plan.  Even though the Debtor believes that the business plan incorporates a range of assumptions that permit the Debtor to meet its Plan obligations even if it does not completely meet every projection in its business plan, factors or events not foreseen or anticipated by the Debtor could adversely affect the ability of the reorganized Debtor to execute its business-plan strategies.  Specifically, the reorganized Debtor's ability to meet its business plan projections is subject to the following risks, among others:

(i)    <u>Industry Conditions and Competition</u>

There can be no assurance that the conditions under which the reorganized Debtor will operate will enable it to achieve the donations, revenues, or gross margins that the Debtor has relied upon to project future business prospects.  Demand and willingness to donate are subject to fluctuations in tastes and discretionary income.  Moreover, donors and subscribers have many choices in organizations to support and the Playhouse may not succeed in obtaining a sufficient share of donations or subscriptions.  The Debtor's ability to obtain donations and subscriptions may be adversely affected by many factors including changes in the public's habits and preferences, demographic and sociocultural patterns, and local and national economic conditions affecting spending habits and the willingness to donate to a nonprofit or purchase season tickets.

(ii)    <u>Operating</u>

Ongoing Plan performance will be funded by donations and internal operations.  Although the Debtor has made every effort, based upon its knowledge of its community, its operations, and the current state of the economy to accurately project its future cash flow as reflected in the business plan, there can be no assurance that the operating cash flow of the reorganized Debtor, after giving effect to operating requirements, will be adequate to fully fund the continued operation of the Playhouse or the continued performance of the Debtor's Plan obligations.

**F.    Executory Contracts and Unexpired Leases**

The Plan, in Exhibit 5.1, lists all executory contracts and unexpired leases that the Debtor will assume under the Plan.  Assumption means that the Debtor has elected to continue to perform the obligations under such contracts and unexpired leases, and to cure defaults of the type that must be cured under the Code, if any.  Exhibit 5.1 also lists how the Debtor will cure and compensate the other party to such contract or lease for any such defaults.

If you object to the assumption of your unexpired lease or executory contract, the proposed cure of any defaults, or the adequacy of assurance of performance, you must file and serve your objection to the Plan within the deadline for objecting to the confirmation of the Plan, unless the Court has set an earlier time.

All executory contracts and unexpired leases that are not listed in Exhibit 5.1 will be rejected under the Plan.  Consult your adviser or attorney for more specific information about particular contracts or leases.

If you object to the rejection of your contract or lease, you must file and serve your objection to the Plan within the deadline for objecting to the confirmation of the Plan.

*The Deadline for Filing a Proof of Claim Based on a Claim Arising from the Rejection of a Lease or Contract Is Thirty Days After the Effective Date of the Plan*.  Any claim based on the rejection of a contract or lease will be barred if the proof of claim is not timely filed, unless the Court orders otherwise.

> ### G.    Tax Consequences of Plan

*Creditors and Equity Interest Holders Concerned with How the Plan May Affect Their Tax Liability Should Consult with Their Own Accountants, Attorneys, And/Or Advisors.*

The following are the anticipated tax consequences of the Plan:

THE FOLLOWING IS INTENDED TO BE ONLY A SUMMARY OF SELECTED FEDERAL AND STATE INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH, AND RECEIPT OF TAX ADVICE FROM, A TAX PROFESSIONAL. THE SELECTED FEDERAL AND STATE TAX CONSEQUENCES THAT ARE DESCRIBED HEREIN AND OTHER FEDERAL, STATE AND LOCAL TAX CONSEQUENCES THAT ARE NOT ADDRESSED HEREIN ARE COMPLEX AND, IN SOME CASES, UNCERTAIN. SUCH TAX CONSEQUENCES MAY ALSO VARY BASED ON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER OF AN ALLOWED CLAIM OR EQUITY INTEREST IN THE DEBTOR.  ACCORDINGLY, AS NOTED ABOVE, EACH HOLDER OF AN ALLOWED CLAIM OR EQUITY INTEREST IS STRONGLY ADVISED TO CONSULT WITH ITS OWN TAX ADVISOR REGARDING THE FEDERAL, STATE AND LOCAL TAX CONSEQUENCES OF THE PLAN. THE BELOW SUMMARY OF TAX CONSEQUENCES IS NOT INTENDED TO BE AND IS NOT TAX ADVISE.  THE DEBTOR DOES NOT INTEND TO REQUEST A TAX RULING FROM THE INTERNAL REVENUE SERVICE OR ANY OTHER TAXING AUTHORITY WITH RESPECT TO ANY OF THE TAX CONSEQUENCES OF THE PLAN. CONSEQUENTLY, THE INTERNAL REVENUE SERVICE OR ANOTHER TAXING AUTHORITY MAY DISAGREE WITH AND MAY CONTEST ONE OR MORE OF THE TAX CONSEQUENCES DESCRIBED HEREIN TO THE DEBTOR, INTEREST HOLDERS OR TO THE EQUITY HOLDERS.

> *1.    Federal Income Tax Consequences to the Creditors*

The character, amount and timing of income, gain or loss the holders of allowed claims recognize as a consequence of the distributions under the Plan will depend upon, among other things, (i) the manner in which the claim was acquired, (ii) the length of time the claim was held, (iii) whether the claim was acquired at a discount, (iv) whether the holder of an allowed claim has taken a bad debt deduction for the claim, (v) whether the holder has previously included accrued but unpaid interest with respect to the claim, (vi) the holder's method of tax accounting, whether the claim is an installment obligation under the tax laws, and (viii) the type of consideration received or deemed received by the holder in exchange for its claim.  In addition, in the event interest is paid on the claim, the holder may have interest income.  Therefore, holders of allowed claims should consult their tax advisors for information that may be relevant to their particular situations and circumstances and the particular tax consequences to such holders as a result thereof.

Depending on the nature of the claim, the Debtor may be required to file information returns with the appropriate taxing agencies to report payments to the holders of allowed claims.  In order to make distributions, the Debtor will require that holders of allowed claims provide certain federal

**B25B (Official Form 25B) (12/08) – Cont.**                                                          18

income taxpayer information, such as the holder's taxpayer identification number.  Should the holder fail to do so within six months of the request, the Debtor may withhold and bar any distribution to that holder, and the other holders' proportionate shares of the amount to be distributed will be recalculated.

> ### 2.    *Tax Consequences to the Debtor*

As a nonprofit public benefit corporation, the Debtor is a tax-exempt entity, and, therefore, the Plan does not have any tax consequences to the Debtor.

## IV.    CONFIRMATION REQUIREMENTS AND PROCEDURES

To be confirmable, the Plan must meet the requirements listed in §§ 1129(a) or (b) of the Code. These include the requirements that the Plan must be proposed in good faith; at least one impaired class of claims must accept the plan, without counting votes of insiders; the Plan must distribute to each creditor at least as much as the creditor would receive in a chapter 7 liquidation case, unless the creditor votes to accept the Plan; and the Plan must be feasible.  These requirements are <u>not</u> the only requirements listed in § 1129, and they are not the only requirements for confirmation.

### A.    **Who May Vote or Object**

Any party in interest may object to the confirmation of the Plan if the party believes that the requirements for confirmation are not met.

Many parties in interest, however, are not entitled to vote to accept or reject the Plan.  A creditor has a right to vote for or against the Plan only if that creditor has a claim or equity interest that is both (1) allowed, or allowed for voting purposes, and (2) impaired.

In this case, the Plan Proponent believes that classes 2, 4(a) and (b), and 5 are impaired and that holders of claims in each of these classes are entitled to vote to accept or reject the Plan.  The Plan Proponent believes that class 6 is also impaired, but that the holders of claims in class 6 are not entitled to receive or retain any property on account of such claims, are deemed not to have accepted the Plan, and are not entitled to vote.  The Plan Proponent believes that classes 1 and 3 are unimpaired, and that the holders of claims in each of those classes, therefore, are deemed to accept the Plan.

> ### 1.    *What Is an Allowed Claim?*

Only a creditor with an allowed claim has the right to vote on the Plan.  Generally, a claim is allowed if either (1) the Debtor has scheduled the claim on the Debtor's schedules, unless the claim has been scheduled as disputed, contingent, or unliquidated, or (2) the creditor has filed a proof of claim, unless an objection has been filed to such proof of claim.  When a claim is not allowed, the creditor holding the claim cannot vote unless the Court, after notice and hearing, either overrules the objection or allows the claim for voting purposes pursuant to Rule 3018(a) of the Federal Rules of Bankruptcy Procedure.

> ***The deadline for filing a proof of claim in this case is no later than thirty days after the date of entry of an order confirming the Plan.***

> ### 2.    *What Is an Impaired Claim or Impaired Equity Interest?*

10718158.3

As noted above, the holder of an allowed claim has the right to vote only if it is in a class that is *impaired* under the Plan.  As provided in § 1124 of the Code, a class is considered impaired if the Plan alters the legal, equitable, or contractual rights of the members of that class.

> 3.      *Who is **Not** Entitled to Vote*

The holders of the following five types of claims are *not* entitled to vote:

- holders of claims that have been disallowed by an order of the Court;

- holders of other claims that are not "allowed claims" (as discussed above), unless they have been "allowed" for voting purposes;

- holders of claims in unimpaired classes;

- holders of claims entitled to priority pursuant to §§ 507(a)(2), (a)(3), or (a)(8) of the Code; and

- holders of claims in classes that do not receive or retain any value under the Plan.

***Even If You Are Not Entitled to Vote on the Plan, You Have a Right to Object to the Confirmation of the Plan and to the Adequacy of this Disclosure Statement.***

> 4.      *Who Can Vote in More Than One Class*

A creditor whose claim has been allowed in part as a secured claim and in part as an unsecured claim, or who otherwise hold claims in multiple classes, is entitled to accept or reject a Plan in each capacity, and should cast one ballot for each claim.

## B.      **Votes Necessary to Confirm the Plan**

If impaired classes exist, the Court cannot confirm the Plan unless (1) at least one impaired class of creditors has accepted the Plan without counting the votes of any insiders within that class, and (2) all impaired classes have voted to accept the Plan, unless the Plan is eligible to be confirmed by "cram down" on non-accepting classes, as discussed later in Section B.2 below.

> 1.      *Votes Necessary for a Class to Accept the Plan*

A class of claims accepts the Plan if both of the following occur: (1) the holders of more than one-half (1/2) of the allowed claims in the class, who vote, cast their votes to accept the Plan, and (2) the holders of at least two-thirds (2/3) in dollar amount of the allowed claims in the class, who vote, cast their votes to accept the Plan.

> 2.      *Treatment of Nonaccepting Classes*

Even if one or more impaired classes reject the Plan, the Court may nonetheless confirm the Plan if the nonaccepting classes are treated in the manner prescribed by § 1129(b) of the Code.  A plan that binds nonaccepting classes is commonly referred to as a "cram down" plan.  The Code allows the Plan to bind nonaccepting classes of claims or equity interests if it meets all the requirements for consensual confirmation except the voting requirements of § 1129(a)(8) of the Code, does not "discriminate unfairly" and is "fair and equitable" toward each impaired class that has not voted to accept the Plan.

*You should consult your own attorney if a "cramdown" confirmation will affect your claim, as the variations on this general rule are numerous and complex.*

### C.     Liquidation Analysis

To confirm the Plan, the Court must find that all creditors who do not accept the Plan will receive at least as much under the Plan as such claim would receive in a chapter 7 liquidation.  A liquidation analysis is attached to this Disclosure Statement as Exhibit E.

### D.     Feasibility

The Court must find that confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor or any successor to the Debtor, unless such liquidation or reorganization is proposed in the Plan.

#### 1.     *Ability to Initially Fund Plan*

The Plan Proponent believes that the Debtor will have enough cash on hand on the Effective Date of the Plan to pay all the claims and expenses that are entitled to be paid on that date.  Tables showing the amount of cash on hand on the Effective Date of the Plan, and the sources of that cash are attached to this Disclosure Statement as Exhibit F.

#### 2.     *Ability to Make Future Plan Payments And Operate Without Further Reorganization*

The Plan Proponent must also show that it will have enough cash over the life of the Plan to make the required Plan payments.

The Plan Proponent has provided projected financial information.  Those projections are listed in Exhibit G.

The Plan Proponent's financial projections show that the Debtor will make the final Plan payment (other than payments arising in the ordinary course under contracts assumed or entered into as part of the Plan), within one year of emergence and that over that period the Debtor projects to generate net income of approximately $100,000 and to have approximately $111,000 in unrestricted cash available.  The Debtor projects income of $3.2 million, which consists primarily of $2 million in donations conditioned on reorganization of the Playhouse pursuant to the Plan, $450,000 in ticket sales, and other fundraising activities.  The Debtor also projects expenses over that same period of $3.1 million, which consist of wages and benefits of $1.4 million, overhead of $620,000, and production expenses of $930,000.  The Debtor has planned to put on two performances at the Playhouse theater within the first year of emergence.

*You Should Consult with Your Accountant or other Financial Advisor If You Have Any Questions Pertaining to These Projections.*

## V.     EFFECT OF CONFIRMATION OF PLAN

### A.     Discharge Of Debtor

On the Effective Date of the Plan, the Debtor shall be discharged from any debt that arose before confirmation of the Plan, subject to the occurrence of the Effective Date, to the extent specified in § 1141(d)(1)(A) of the Code, except that the Debtor shall not be discharged of any debt (i) imposed by the Plan, (ii) of a kind specified in § 1141(d)(6)(A) if a timely complaint was filed in accordance with Rule 4007(c) of the Federal Rules of Bankruptcy Procedure, or (iii) of a kind specified in § 1141(d)(6)(B).  After the Effective Date of the Plan your claims against the Debtor will be limited to the debts described in clauses (i) through (iii) of the preceding sentence.

### B.    Modification of Plan

The Plan Proponent may modify the Plan at any time before confirmation of the Plan. However, the Court may require a new disclosure statement and/or revoting on the Plan.

The Plan Proponent may also seek to modify the Plan at any time after confirmation only if (1) the Plan has not been substantially consummated, *and* (2) the Court authorizes the proposed modifications after notice and a hearing.

### C.    Final Decree

Once the estate has been fully administered, as provided in Rule 3022 of the Federal Rules of Bankruptcy Procedure, the Plan Proponent, or such other party as the Court shall designate in the Plan Confirmation Order, shall file a motion with the Court to obtain a final decree to close the case. Alternatively, the Court may enter such a final decree on its own motion.

## VI.    OTHER PLAN PROVISIONS

### A.    Definitions and Rules of Construction

The definitions and rules of construction set forth in §§ 101 and 102 of the Bankruptcy Code shall apply when terms defined or construed in the Bankruptcy Code are used in this Disclosure Statement.  Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Plan.

### B.    Retention of Jurisdiction

The Court shall retain such jurisdiction with respect to all matters related to this bankruptcy case, the Debtor and the Plan as is legally permissible.

### C.    Exculpation

The Exculpated Parties shall neither have nor incur any liability to any entity for any claims or causes of action arising on or after the petition date and prior to or on the Effective Date for any act taken or omitted to be taken in connection with, or related to formulating, negotiating, preparing, disseminating, implementing, administering, confirming or effecting the consummation of the Plan, this Disclosure Statement or any sale, contract, instrument, release, or other agreement or document created or entered into in connection with the Plan or any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtor, the approval of this Disclosure Statement, confirmation or consummation of the Plan; *provided however,* that the foregoing provisions shall have no effect on the liability of any Entity that results from any

such act or omission that is determined in a final order of the Bankruptcy Court or other court of competent jurisdiction to have constituted gross negligence or willful misconduct; *provided further*, that each Exculpated Party shall be entitled to rely upon the advice of counsel concerning its duties pursuant to, or in connection with, the above referenced documents, actions, or inactions; *provided, further, however* that the foregoing provisions shall not apply to any acts, omissions, claims, causes of action, or other obligations expressly set forth in and preserved by the Plan.

D.    **Effective Date of Plan**

The Effective Date of the Plan is the fifteenth business day following the date of the entry of the order of confirmation.  But if a stay of the confirmation order is in effect on that date, the Effective Date will be the first business day after that date on which no stay of the confirmation order is in effect, provided that the confirmation order has not been vacated.

E.    **Severability**

If any provision in the Plan is determined to be unenforceable, the determination will in no way limit or affect the enforceability and operative effect of any other provision of the Plan.

F.    **Binding Effect**

The rights and obligations of any entity named or referred to in the Plan will be binding upon, and will inure to the benefit of the successors or assigns of such entity.

**B25B (Official Form 25B) (12/08) – Cont.**                                              23

### G.    Controlling Effect

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code or the Federal Rules of Bankruptcy Procedure), the laws of the State of California govern the Plan and any agreements, documents, and instruments executed in connection with the Plan, except as otherwise provided in the Plan or the relevant agreement, document or instrument.

Respectfully submitted,

Dated: May 25, 2010                     By:

Stephen Eich, Executive Director of the Debtor
Proponent of the Plan

Dated: May 25, 2010                     By:

Thomas B. Walper
Attorney for the Proponent of the Plan

B25B (Official Form 25B) (12/08) – Cont.                                                        23

### G.    Controlling Effect

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code or the Federal Rules of Bankruptcy Procedure), the laws of the State of California govern the Plan and any agreements, documents, and instruments executed in connection with the Plan, except as otherwise provided in the Plan or the relevant agreement, document or instrument.


Respectfully submitted,


Dated:  May 25, 2010                    By:_____
                                        Stephen Eich, Executive Director of the Debtor
                                        Proponent of the Plan


Dated:  May 25, 2010                    By:_____
                                            Thomas B. Walper
                                        Attorney for the Proponent of the Plan


10718158.3

# EXHIBITS

**Exhibit A – Copy of Proposed Plan of Reorganization**

**B25A (Official Form 25A) (12/08)**

Thomas B. Walper (CA Bar No. 096667)
Bernard A. Eskandari (CA Bar No. 244395)
M. Lance Jasper (CA Bar No. 244516)
MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue
Thirty-Fifth Floor
Los Angeles, California 90071-1560
Telephone:      (213) 452-5593
Facsimile:      (213) 687-3702
Email:          thomas.walper@mto.com
                bernard.eskandari@mto.com
                lance.jasper@mto.com

Proposed *Pro Bono* Bankruptcy Counsel for
Debtor and Debtor-in-Possession

**UNITED STATES BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| In re<br><br>THE PASADENA PLAYHOUSE STATE THEATRE OF CALIFORNIA, INC., a California nonprofit public benefit corporation,<br><br>Debtor and Debtor-in-Possession. | Case No. 2:10-bk-28586-TD<br><br>Chapter 11<br><br>**SMALL BUSINESS CASE UNDER FRBP 1020**<br><br>**SECOND AMENDED PLAN OF REORGANIZATION**<br><br>**<u>Hearing</u>**<br>Date:      July 7, 2010<br>Time:     3:00 p.m.<br>Place:    Courtroom 1345<br>             255 East Temple Street<br>             Los Angeles, California 90012 |

10692721.4

**B25A (Official Form 25A) (12/08) - Cont.**                                                          2

# ARTICLE I
## SUMMARY

     This First Amended Plan of Reorganization (the "Plan") under chapter 11 of the Bankruptcy Code (the "Code") proposes to satisfy creditors of The Pasadena Playhouse State Theatre of California, Inc., a California nonprofit public benefit corporation ("Pasadena Playhouse," "Playhouse," or "Debtor") principally from the generous donations from supporters of the arts and theater within the local community.  The Plan provides that secured claims will be satisfied in full, receive a return of their collateral, or enter into an amended agreement with the Debtor.  The Plan further provides that the Debtor will continue to use the Playhouse theater for theatrical productions under a sublease with the City of Pasadena, and that the Debtor will honor its obligations to the Playhouse subscription holders in full.  Due to the Debtor's limited assets, the size of the administrative and priority claims in this case, and the relative rights of creditors under the Code, the class of general unsecured claims will not receive a distribution under this Plan.  As a nonprofit public benefit corporation, the Debtor does not have equity holders.

     All creditors should refer to Articles II through VI of this Plan for information regarding the precise treatment of their claim(s).  A disclosure statement that provides more detailed information regarding this Plan and the rights of creditors has been circulated with this Plan.  **Your rights may be affected.  You should read these papers carefully and discuss them with your attorney.  (If you do not have an attorney, you may wish to consult one.)**

# ARTICLE II
## CLASSIFICATION OF CLAIMS AND INTERESTS

2.01   <u>Class 1</u>.       All claims of creditors to the extent allowed as secured claims under § 506 of the Code and for which the Debtor has elected to surrender the property securing such claims to the creditor.

2.02   <u>Class 2</u>.       All claims of creditors to the extent allowed as secured claims under § 506 of the Code and for which the Debtor has not elected to surrender the property securing such claims to the creditor and the creditor has agreed to treatment under a new loan or lease agreement.

2.03   <u>Class 3</u>.       All allowed claims entitled to priority under § 507 of the Code (except administrative expense claims under § 507(a)(2) and priority tax claims under § 507(a)(8) and Season Subscription Claims that are not treated under Class 4).

2.04   <u>Class 4</u>.       Convenience Season Subscription Claims.

2.05   <u>Class 5</u>.       Pasadena Sublease.

10692721.4

2.06    <u>Class 6</u>.          General Unsecured Claims.

## ARTICLE III
## <u>TREATMENT OF ADMINISTRATIVE EXPENSE CLAIMS, U.S. TRUSTEES FEES, PRIORITY TAX CLAIMS, AND OTHER UNCLASSIFIED CLAIMS</u>

3.01    <u>Unclassified Claims</u>.  Under § 1123(a)(1) of the Code, administrative expense claims and priority tax claims are not in classes.  This Plan also does not classify Season Subscription Claims and United States Trustee Fees, which are treated as set forth below under 3.04 and 3.05.

3.02    <u>Administrative Expense Claims</u>.  Each holder of an administrative expense claim allowed under § 503 of the Code will be paid in full on the Effective Date of this Plan (as defined in Article VII), in cash, or upon such other terms as may be agreed upon by the holder of the claim and the Debtor.

3.03    <u>Priority Tax Claims</u>.  Each holder of a priority tax claim will be paid consistent with § 1129(a)(9)(C) of the Code.

3.04    <u>Unclassified Season Subscription Claims</u>.  Each holder of a claim arising from the purchase of a Season Subscription shall have its rights honored through the receipt of tickets over time to theatrical performances pursuant to the terms of the Season Subscription.  The terms of the Season Subscription provide, among other things, that the ticket is non-refundable and that the plays, dates and artists are subject to change.  Holders of Season Subscription Claims may elect instead to be classified in Class 4(a) or (b) and receive the treatment described below in Article IV.

3.05    <u>Unclassified United States Trustee Fees</u>.  All fees required to be paid by 28 U.S.C. § 1930(a)(6) (U.S. Trustee Fees) will accrue and be timely paid until the case is closed, dismissed or converted to another chapter of the Code.  Any U.S. Trustee Fees owed on or before the effective date of this Plan will be paid on the effective date.

B25A (Official Form 25A) (12/08) - Cont.                                                                 4

## ARTICLE IV
## TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN

4.01    Treatment.  Claims and interests shall be treated as follows under this Plan:

| Class | Impairment and Voting | Treatment |
|---|---|---|
| Class 1 - Secured Claims | Unimpaired, Not Entitled to Vote | Class 1 is unimpaired by this Plan, and each holder of a Class 1 Claim shall receive either a return of the property securing the holder's claim or the holder's rights shall otherwise not be altered under the Plan. |
| Class 2 - Secured Claims | Impaired, Entitled to Vote | Class 2 is impaired by this Plan, and each holder of a Class 2 Claim shall receive a newly negotiated loan or lease agreement, which shall be filed with the Court within fifteen days of the date first set for the confirmation hearing. |
| Class 3 - Priority Claims under §§ 507(a)(1), (4), (5), or (6) | Unimpaired, Not Entitled to Vote | Class 3 is unimpaired by this Plan, and each holder of a Class 3 Priority Claim will be paid in full, in cash, upon the later of the Effective Date of this Plan as defined in Article VII, or the date on which such claim is allowed by a final non-appealable order. |
| Class 4(a) - Season Subscription Claims Performance Election Class (Convenience) | Impaired, Entitled to Vote | Class 4(a) is impaired.  Each holder of a Season Subscription that entitles the holder to a ticket to three or more performances at the Playhouse theater that elects treatment under Class 4(a) shall, on the Effective Date, receive, in full and complete satisfaction of the holder's Season Subscription Claim, one ticket to each of the next two performances at the Playhouse theater for each Season Subscription Claim. |
| Class 4(b) – Season Subscription Claims Contribution Election Class (Convenience) | Impaired, Entitled to Vote | Class 4(b) is impaired.  Each holder of a Season Subscription Claim that elects treatment under Class 4(b) shall, on the Effective Date, be deemed to contribute the value of the Season Subscription Claim to the reorganized Debtor and will receive a letter acknowledging that contribution. |

B25A (Official Form 25A) (12/08) - Cont.                                                    5

| Class 5 - Pasadena Sublease | Impaired, Entitled to Vote | Class 5 is impaired by this Plan. On the Effective Date, the Pasadena Sublease shall commence on the terms set forth in Exhibit __. In the event the Court determines that the treatment of the Class 5 Claim is not consistent with the Bankruptcy Code or the holder of the Class 5 Claim does not vote to accept the treatment under this Class 5 of this Plan, the Debtor shall assume the Pasadena Sublease in accordance with this Plan. |
| Class 6 - General Unsecured Creditors | Impaired, Not Entitled to Vote | Class 6 is impaired and shall receive no distributions under this Plan. Class 6 is deemed to reject this Plan. |

## ARTICLE V
## ALLOWANCE AND DISALLOWANCE OF CLAIMS

5.01    Disputed Claim.  A disputed claim is a claim that has not been allowed or disallowed by a final non-appealable order and as to which either (i) a proof of claim has been filed or deemed filed, and the Debtor or another party in interest has filed an objection, or (ii) no proof of claim has been filed, and the Debtor has scheduled such claim as disputed, contingent or unliquidated.

5.02    Delay of Distribution on a Disputed Claim.  No distribution will be made on account of a disputed claim unless such claim is allowed by a final non-appealable order.

5.03    Settlement of Disputed Claims.  The Debtor will have the power and authority to settle and compromise a disputed claim with court approval and compliance with Rule 9019 of the Federal Rules of Bankruptcy Procedure.

## ARTICLE VI
## PROVISIONS FOR EXECUTORY CONTRACTS AND UNEXPIRED LEASES

6.01    Assumed Executory Contracts and Unexpired Leases.

(a)    The Debtor shall assume certain executory contracts and unexpired leases pursuant to a schedule which shall be filed with the Court within fifteen days of the first date set for hearing on confirmation of this Plan.

(b)    The Debtor will be conclusively deemed to have rejected all executory contracts and/or unexpired leases not expressly assumed under section 6.01(a) above, or before the date of the order confirming this Plan, upon the date of the entry of the order confirming this Plan.  A proof of a claim arising from the rejection of an executory contract or unexpired lease

10692721.4

under this section must be filed no later than thirty days after the date of entry of an order confirming this Plan.

**ARTICLE VII**
**MEANS FOR IMPLEMENTATION OF THE PLAN**

      7.01   <u>Implementation</u>.  The Debtor has obtained commitments in significant amounts for post-emergence operations.  These amounts are sufficient to underwrite the operations of the reorganized Debtor pursuant to the detailed budget set forth in the Disclosure Statement accompanying this Plan.  That budget provides for the Debtor to resume theatrical performances at the Playhouse as practicable and fiscally prudent.  The Debtor will honor its obligations to holders of a Season Subscription through tickets to these post-emergence productions.  Please refer to the Disclosure Statement for further detail on the reorganized Debtor's operations, management and business plan.  All assets of the Debtor shall revest in the reorganized Debtor on the Effective Date.

**ARTICLE VIII**
**BAR DATE**

      8.01   <u>Deadline to File Proof of Claim</u>.  Except to the extent set forth in Rule 3003(c)(3) of the Federal Rules of Bankruptcy Procedure, the deadline for any entity to file a proof of claim, including claims arising under section 6.01(b) of this Plan, shall be no later than thirty days after the date of entry of an order confirming this Plan.

**ARTICLE IX**
**GENERAL PROVISIONS**

      9.01   <u>Definitions and Rules of Construction</u>.  The definitions and rules of construction set forth in §§ 101 and 102 of the Code shall apply when terms defined or construed in the Code are used in this Plan, and they are supplemented by the following definitions:

        "Disclosure Statement" means the Disclosure Statement circulated with this Plan.

        "Exculpated Parties" means, collectively, the Debtor and its estate and the Related Persons of each of their respective officers, directors or employees.

        "General Unsecured Claim" shall mean a claim arising before the commencement of the case that is not a secured claim, a Season Subscription Claim, a claim arising from the Pasadena Sublease or a claim entitled to priority under § 507 of the Code.

        "Pasadena Sublease" means that certain sublease between the Debtor and the City of Pasadena that grants possession and use of the Pasadena Playhouse, among other things, to the Debtor.

10692721.4

"Related Persons" means, with respect to any person, such person's predecessors, successors, assigns and present and former affiliates (whether by operation of law or otherwise) and subsidiaries, and each of their respective current and former officers, directors, principals, employees, shareholders, members (including *ex officio* members), partners, agents, financial advisors, attorneys, accountants, investment bankers, investment advisors, consultants, representatives and other professionals, in each case acting in such capacity on or any time after the petition date, and any person claiming by or through any of them.

"Season Subscription Claim" means a claim arising from the purchase of one or more Season Subscriptions, as set forth in Schedule E to the Debtor's chapter 11 bankruptcy petition.

"Season Subscription" means the purchase of one ticket to a particular number of performances at the Pasadena Playhouse under the terms and conditions of the subscription agreement.

9.02    Effective Date of Plan. The effective date of this Plan is the fifteenth day following the date of the entry of the order of confirmation (the "Effective Date").  But if a stay of the confirmation order is in effect on that date, the effective date will be the first business day after that date on which no stay of the confirmation order is in effect, provided that the confirmation order has not been vacated.

9.03    Severability.  If any provision in this Plan is determined to be unenforceable, the determination will in no way limit or affect the enforceability and operative effect of any other provision of this Plan.

9.04    Binding Effect.  The rights and obligations of any entity named or referred to in this Plan will be binding upon and will inure to the benefit of the successors or assigns of such entity.

9.05    Captions.  The headings contained in this Plan are for convenience of reference only and do not affect the meaning or interpretation of this Plan.

9.06    Controlling Effect.  Unless a rule of law or procedure is supplied by federal law (including the Code or the Federal Rules of Bankruptcy Procedure), the laws of the State of California govern this Plan and any agreements, documents, and instruments executed in connection with this Plan, except as otherwise provided in this Plan or the relevant agreement, document, or instrument.

9.07    Corporate Governance.  Amended articles and bylaws will be filed with the Court within fifteen days of the first date set for hearing on confirmation of this Plan.

10692721.4

**B25A (Official Form 25A) (12/08) - Cont.** 8

## ARTICLE X
## DISCHARGE

10.01. <u>Discharge</u>. On the confirmation date of this Plan, the debtor will be discharged from any debt that arose before confirmation of this Plan, subject to the occurrence of the effective date, to the extent specified in § 1141(d)(1)(A) of the Code, except that the Debtor will not be discharged of any debt (i) imposed by this Plan; (ii) of a kind specified in § 1141(d)(6)(A) of the Code, if a timely complaint was filed in accordance with Rule 4007(c) of the Federal Rules of Bankruptcy Procedure, or (iii) of a kind specified in § 1141(d)(6)(B) of the Code.

## ARTICLE XI
## RETENTION OF JURISDICTION

11.01 <u>Jurisdiction</u>. The Court shall retain such jurisdiction with respect to all matters related to this bankruptcy case, the Debtor and this Plan as is legally permissible.

## ARTICLE XII
## OTHER PROVISIONS

12.01 <u>Exculpation</u>. The Exculpated Parties shall neither have nor incur any liability to any entity for any claims or causes of action arising on or after the petition date and prior to or on the Effective Date for any act taken or omitted to be taken in connection with, or related to formulating, negotiating, preparing, disseminating, implementing, administering, confirming or effecting the consummation of this Plan, the Disclosure Statement or any sale, contract, instrument, release or other agreement or document created or entered into in connection with this Plan or any other prepetition or post-petition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtor, the approval of the Disclosure Statement, confirmation or consummation of this Plan; *provided* *however,* that the foregoing provisions shall have no effect on the liability of any Entity that results from any such act or omission that is determined in a final order of the Bankruptcy Court or other court of competent jurisdiction to have constituted gross negligence or willful misconduct; *provided further,* that each Exculpated Party shall be entitled to rely upon the advice of counsel concerning its duties pursuant to, or in connection with, the above referenced documents, actions or inactions; *provided further however,* that the foregoing provisions shall not apply to any acts, omissions, claims, causes of action or other obligations expressly set forth in and preserved by this Plan.

*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]*

*[SIGNATURE PAGE FOLLOWS]*

10692721.4

B25A (Official Form 25A) (12/08) - Cont.                                          9

Respectfully submitted,

Dated:  May 25, 2010             By: _____
                                Stephen Eich, Executive Director of the Debtor
                                Proponent of this Plan

Dated:  May 25, 2010            By:_____
                                     Thomas B. Walper
                                Attorney for the Proponent of this Plan

**B25A (Official Form 25A) (12/08) - Cont.**                                                9

Respectfully submitted,

Dated:  May 25, 2010                    By:_____
                                        Stephen Eich, Executive Director of the Debtor
                                        Proponent of this Plan

Dated:  May 25, 2010                    By:_____
                                            Thomas B. Walper
                                        Attorney for the Proponent of this Plan

10692721.4

## Exhibit B – Identity and Value of Material Assets of Debtor

# OSTRIN & OSTRIN CO.

### AUCTIONEERS

4101 BIRCH STREET, SUITE 150, NEWPORT BEACH, CA 92660
(949) 261-6169    FAX: (949) 261-5118

February 22, 2010

Mr. Richard Diamond, Trustee
2029 Century Park East
3rd Floor
Los Angeles, CA. 90067                                  Re: Pasadena Playhouse

Dear Mr. Diamond:

Last week I had the opportunity to conduct a cursory review and inventory of the personal property belonging to Pasadena Playhouse located at 39 S. Molino Avenue, Pasadena, California.

I am of the opinion the attached inventory has a Liquidation Value of approximately $24,564.00.

The Liquidation Value represents the approximate amount these items may bring at a piecemeal public auction sale conducted on site.

A representative of Pasadena Playhouse sent me the enclosed computer disk setting forth an inventory of items prepared by a representative of Pasadena Playhouse, however, I did not attempt to validate the information.

In addition, page 11. contains a list of furnishings, etc., which have been declared the property of third parties.

If you require further information please do not hesitate to contact me.

Sincerely,

OSTRIN & OSTRIN

Gary Ostrin

GO:pw

cc: Aaron E. de Leest, Esq.

# OSTRIN & OSTRIN CO.

### AUCTIONEERS

4101 BIRCH STREET, SUITE 150, NEWPORT BEACH, CA 92660
(949) 261-6169   FAX: (949) 261-5118

PASADENA PLAYHOUSE
39 S. EL MOLINO AVENUE
PASADENA, CA. 91101

### INVENTORY

| QUANTITY | DESCRIPTION | LIQUIDATION VALUE |
|---|---|---|
| **MAIN TICKET OFFICE:** | | |
| 1 | KYOCERA KM2050 COPIER | $ 150.00 |
| 5 | DELL COMPUTERS WITH FLAT SCREEN MONITORS | 600.00 |
| 1 | LATHEM TIME CLOCK | 40.00 |
| 2 | BOCA TICKET SYSTEMS | 150.00 |
| 4 | BLACK SWIVEL CHAIRS | 40.00 |
| 1 | GRAY POSTURE CHAIR | 5.00 |
| 1 | STEREO SYSTEM | 20.00 |
| LOT | TELEPHONES WITH ELECTRONICS (THROUGH OUT PREMISES) | 400.00 |
| 3 | WHITE PLASTIC CABINETS | 5.00 |
| 1 | WHITE TWO DRAWER FILE CABINET | 5.00 |
| 1 | SAFETRON SINGLE DOOR SAFE | 25.00 |
| 1 | WOOD 60" DESK | 10.00 |
| 1 | BLACK SWIVEL ARM CHAIR | 10.00 |
| 1 | STAINLESS STEEL 1/2 SIZE REFRIGERATOR | 40.00 |
| 1 | FRIGIDAIRE TWO DOOR REFRIGERATOR | 35.00 |
| 5 | COFFEE MAKERS | 50.00 |
| 2 | BENCHES | 10.00 |
| 1 | SHELF | 5.00 |

# Ostrin & Ostrin Co.
## AUCTIONEERS
4101 BIRCH STREET, SUITE 150, NEWPORT BEACH, CA 92660
(949) 261-6169    FAX: (949) 261-5118

PASADENA PLAYHOUSE
INVENTORY, PAGE 2.

| QUANTITY | DESCRIPTION | LIQUIDATION VALUE |
|---|---|---|
| 1 | ALUMINUM LADDER | $ 10.00 |
| 4 | PLASTIC TUBS | 4.00 |
| 4 | RED PLASTIC TUBS | 12.00 |
| 3 | WHITE 6 FT. FOLDING TABLES | 21.00 |
| 5 | CHAIRS | 5.00 |
| 2 | CARTS | 5.00 |
| 1 | ROSE BOWL PLAQUE (FLOWER VASE) | 25.00 |
| 2 | FOLDING CHAIRS | 5.00 |
| 1 | TRASH BOX | 5.00 |
| 2 | CHROME STANDS | 10.00 |
| 2 | TRACK LIGHTING UNITS WITH (25) SPOT LIGHTS(ATTACHED TO CEILING) | 50.00 |
| 1 | U-SHAPED PATIO BAR | 25.00 |
| 1 | 4 FT. BENCH | 10.00 |

DOWNSTAIRS GREEN ROOM:

| | | |
|---|---|---|
| 4 | BLACK UPHOLSTERED SOFAS | 120.00 |
| 1 | 4 FT. X 4 FT. WALNUT COFFEE TABLE | 10.00 |
| 1 | RCA TELEVISION | NO VALUE |
| 1 | CORNER TABLE | 4.00 |
| 2 | FLOOR LAMPS | 3.00 |
| 9 | FANS | 45.00 |

# OSTRIN & OSTRIN CO.
## AUCTIONEERS
4101 BIRCH STREET. SUITE 150, NEWPORT BEACH. CA 92660
(949) 261-6169   FAX: (949) 261-5118

PASADENA PLAYHOUSE
INVENTORY, PAGE 3.

| QUANTITY | DESCRIPTION | LIQUIDATION VALUE |
|---|---|---|
| 7 | CHROME WIRE RACKS | $ 105.00 |
| 9 | COTS | 27.00 |
| 1 | STAND | 5.00 |
| 2 | FANS | 10.00 |
| 2 | 6 FT. X 2 FT. GOLD FRAMED MIRRORS | 60.00 |
| LOT | ITEMS CONSISTING OF: (3) CHAIRS; (3) WOOD PEDESTALS, CABINET | 5.00 |
| 40 | BLACK STACK CHAIRS | 120.00 |
| 2 | RED LEATHER ARM CHAIRS | 80.00 |
| 1 | TAN LEATHER SETTEE | 75.00 |
| 1 | WALL CLOCK | 5.00 |
| LOT | ITEMS CONSISTING OF: REFRIGERATOR, WATER DISPENSER, COFFEE MACHINES, TOASTER, MICRROWAVE OVEN, KITCHEN SUPPLIES | 75.00 |

CLIMATE CONTROL ROOM:

| QUANTITY | DESCRIPTION | LIQUIDATION VALUE |
|---|---|---|
| LOT | ITEMS CONSISTING OF: (2) DELL COMPUTERS WITH FLATS SCREEN MONITOR, (2) HUBS, (1) RACK, (3) SERVERS, COMPUTERS, (2) MONITORS; (1) FOLDING TABLE; (1) FAN; (1) CHAIR; (1) DESK AND (1) BOOKCASE | 500.00 |
| 2 | WALL MOUNTED CPU'S | 40.00 |
| 2 | COMPAC POWER SUPPLY | 40.00 |

SOUND EQUIPMENT ROOM:

| QUANTITY | DESCRIPTION | LIQUIDATION VALUE |
|---|---|---|
| 4 | TWO DOOR METAL CABINETS | 60.00 |

# OSTRIN & OSTRIN Co.
### AUCTIONEERS

4101 BIRCH STREET, SUITE 150, NEWPORT BEACH, CA 92660
(949) 261-6169    FAX: (949) 261-5118

PASADENA PLAYHOUSE
INVENTORY, PAGE 4.

| QUANTITY | DESCRIPTION | LIQUIDATION VALUE |
|---|---|---|
| 20 | MICROPHONES | $ 400.00 |
| 9 | MICROPHONES B320B | 270.00 |
| 6 | MICROPHONES NEUMAN KM184 WITH CASES | 180.00 |
| 4 | STENNHEISER PENCIL MICROPHONE | 200.00 |
| 4 | AKG C747 MICROPHONE | 200.00 |
| 4 | BATTERY PACKS | 40.00 |
| 6 | FLOOR MICROPHONES | 30.00 |
| 4 | STENNHEISER MD421-11 MICROPHONES | 200.00 |
| 2 | SAMSON S11 MICROPHONES | 100.00 |
| 3 | SHURE SM81LC MICROPHONES | 30.00 |
| 12 | SHURE UIVA CLIP ON BATTERY TRANSMITTERS | 60.00 |
| 4 | HAND MICROPHONES | 28.00 |
| LOT | SUPPLIES; ETC. | 50.00 |
| 13 | HEAD SETS WITH BATTERY BACKS | 260.00 |
| 14 | ASST. TRANSMITTERS | 70.00 |
| 1 | 4" MONITOR | 5.00 |
| 1 | AMPLIFIER | 5.00 |
| 10 | ASST. SPEAKERS | 50.00 |
| LOT | MISC. CAMERA EQUIPMENT; SPEAKER | 100.00 |
| LOT | APPROX. 13 PCS. CONSISTING OF (5) SPEAKERS; (2) TRIPLE MONITORS; (2) SINGLE MONITORS; (4) PANASONIC MONITOR | 75.00 |

Feb 22 10 10:19a      Ostrin & Ostrin Company

# OSTRIN & OSTRIN Co.

**AUCTIONEERS**

4101 BIRCH STREET, SUITE 150, NEWPORT BEACH, CA 92660
(949) 261-6169    FAX: (949) 261-5118

PASADENA PLAYHOUSE
INVENTORY, PAGE 5.

| QUANTITY | DESCRIPTION | LIQUIDATION VALUE |
|---|---|---|
| LOT | ITEMS CONSISTING OF: (1) RACK WITH (8) CREST AUDIO 7001 POWER AMPLIFIERS; (1) SHURE 267 CONTROL; (1) WP9220 TWO CHANNEL AMPLIFIER & (1) DENON DNA850 ZONE MIX 6VP | $    400.00 |
| LOT | ITEMS CONSISTING OF; (1) RACK WITH (7) CREST AUDIO 7001 POWER AMPLIFIERS; (1) OMNI DRIVE LOUD SPEAKER AMP; (1) FURMAN FL-8 POWER CONDITIONER & (1) VARICURVE FCS-920 ANALYZER | 350.00 |
| LOT | ITEMS CONSISTING OF (2) CROWN 600 POWER AMPS; (1) TWO CHANNEL POWER AMP; (3) DYNAMIC DPRII EQUALIZERS; (1) VARICURVE 926 DUAL ANALYZER & (1) DENON DCD425 DISC PLAYER | 300.00 |
| 18 | ASST. ANALYZERS; AMPS; ETC. | 180.00 |
| LOT | ITEMS CONSISTING OF: (2) YAMAHA 020031 EQUALIZERS; (2) LEXICON 300L DIGITAL UNITS; (1) FOLDING TABLE; (2) MONITORS & (2) MARS UNITS | 150.00 |
| LOT | MISC. MAINTENANCE ITEMS | 50.00 |
|  | ITEMS CONSISTING OF ROOM & CONTENTS: (1) METAL BED; (2) ROUND TABLES; (4) STACK CHAIRS; (1) WOOD CHAIR; (1) HEATER; (1) UPRIGHT PIANO; (4) FOLDING TABLES; (2) TUBS; (1) WOOD 6 FT. WALL MIRROR | 125.00 |
| 1 | WASHING MACHINE | 20.00 |
| 1 | CABINET | 10.00 |
| 4 | WASHERS & DRYERS | 160.00 |

SOUND STORAGE ROOM:

| | | |
|---|---|---|
| LOT | ITEMS CONSISTING OF (1) SHELF WITH MISC. ADAPTERS; SPLITTER; TAPS; CLAMPS; PADS; (2) STOOLS; WIRE; EXTENSION CORDS; CONNECTORS; CORDS; JBL SPEAKER; LIGHT STANDS; KEYBOARD; MUSIC STANDS; CONTROLS; AMPS; MIXERS; EQUALIZERS; MIXING BOARD; ETC. | 2,000.00 |

# OSTRIN & OSTRIN CO.

**AUCTIONEERS**

4101 BIRCH STREET, SUITE 150, NEWPORT BEACH, CA 92660

(949) 261-6169   FAX: (949) 261-5118

PASADENA PLAYHOUSE
INVENTORY, PAGE 6.

| QUANTITY | DESCRIPTION | LIQUIDATION VALUE |
|---|---|---|
| **COSTUME ROOM:** | | |
| LOT | ITEMS CONSISTING OF: (3) CLOTHIES STEAMERS; APPROX. (20) CHROME CLOTHING RACKS; DESK; TABLE; SEWING; DELL DESK TOP COMPUTER WITH FLAT SCREEN MONITOR; SCALE; (1) FOLDING TABLE; (1) DESK; (2) CHAIRS; ETC. | $ 400.00 |
| 1 | BERNINA 1008 SEWING MACHINE | 100.00 |
| 1 | BERNINA 0016 OVERLOCK SEWER MACHINE | 150.00 |
| 1 | DELL COMPUTER WITH FLAT SCREEN MONITOR | 150.00 |
| 12 | FOOT MASSAGE MACHINES | |
| LOT | APPROX. (100) CARTONS CLOTHING AND SHIRTS ESTIMATED 1,000 GARMENTS | 500.00 |
| LOT | APPROX. 1,500 COSTUME GARMENTS | 1,500.00 |
| **HALL AREA:** | | |
| 5 | TWO DOOR CABINETS | 75.00 |
| LOT | ITEMS CONSISTING OF: (2) VACUUM CLEANERS; (2) WOOD TWO DOOR CABINETS | 75.00 |
| LOT | ITEMS CONSISTING OF: (1) KYOCERA C4579 COPIER; (1) REFRIGERATOR; (1) PAPER CUTTER; (1) DELL COMPUTER WITH FLAT SCREEN MONITOR; (1) SETTEE; (1) DESK; (1) TELEVISION | 200.00 |
| **WIG ROOM:** | | |
| LOT | ASST. MISC. ITEMS | 50.00 |

# OSTRIN & OSTRIN CO.

### AUCTIONEERS

4401 BIRCH STREET, SUITE 150, NEWPORT BEACH, CA 92660
(949) 261-6169    FAX: (949) 261-5118

PASADENA PLAYHOUSE
INVENTORY, PAGE 7.

| QUANTITY | DESCRIPTION | LIQUIDATION VALUE |
|---|---|---|
| **STAGE LIGHTING ROOM:** | | |
| LOT | ITEMS CONSISTING OF: ELECTRICAL CARDS, SPOT LIGHTS AND ACCESSORIES | $ 500.00 |
| 1 | SENSOR STAGE LIGHTING CONSOLE, 3 SECTIONS (PROBABLE LEASEHOLD IMPROVEMENT) | 400.00 |
| **STAGE MANAGER'S OFFICE:** | | |
| LOT | ITEMS CONSISTING OF: (2) DESKS; HEATER; (2) CHAIRS; RACK; (1) DELL COMPUTER WITH FLAT SCREEN MONITOR; (2) MICROWAVE OVENS; (1) SMALL REFRIGERATOR; (1) HEWLETT PACKARD PRINTER | 75.00 |
| **BANG HEAD OFFICE:** | | |
| LOT | ITEMS CONSISTING OF: (1) REFRIGERATOR; (1) SOFA; (3) CHAIRS; (1) DELL COMPUTER WITH FLAT SCREEN MONITOR; (3) DESKS AND TABLE; (1) VACUUM; TOOLS | 25.00 |
| **BACK STAGE SHOP:** | | |
| 1 | INGERSOLL RAND 5 H.P. COMPRESSOR | 300.00 |
| 1 | ACETYLENE SET | 50.00 |
| 1 | 18" DISK GRINDER | 150.00 |
| 1 | STANLEY DOUBLE END GRINDER | 40.00 |
| 1 | BUFFALO BENCH DRILL PRESS | 40.00 |
| 1 | TABLE WITH VISE | 20.00 |
| 1 | CHOP SAW | 40.00 |
| 1 | HORIZONTAL BAND SAW | 50.00 |
| 1 | MILLER WELDER WITH HEAD | 400.00 |

# OSTRIN & OSTRIN CO.
## AUCTIONEERS
4101 BIRCH STREET. SUITE 150. NEWPORT BEACH. CA 92660
(949) 261-6169   FAX: (949) 261-5118

PASADENA PLAYHOUSE
INVENTORY, PAGE 8.

| QUANTITY | DESCRIPTION | LIQUIDATION VALUE |
|---|---|---|
| 1 | FLOOR MODEL DRILL PRESS | 70.00 |
| **STAGE TOOL ROOM:** | | |
| 1 | PORTABLE 2 H.P. COMPRESSOR | 100.00 |
| 2 | VACUUMS | 50.00 |
| 1 | LINCOLN SP1357 STUD GUN | 300.00 |
| 9 | POWER STAPLERS | 360.00 |
| 40 | ASST. ELECTRICAL TOOLS | 1,000.00 |
| LOT | ITEMS CONSISTING OF: LIGHTS; HAND TOOLS; EXTENSION CORDS; CLAMPS; SLINGS; ETC. | 300.00 |
| LOT | CONTENTS OF (3) STAGE OFFICES CONSISTING OF: OFFICE #1: DELL COMPUTER WITH FLATSCREEN MONITOR; (1) SOFA; DESK; CHAIR; FILE; LAMPS; (3) RIFLES; (4) HAND GUNS (INOPERABLE), (1) HEWLETT PACKARD OFFICE JET COPIER; OFFICE #2: FIVE DRAWER DRAFT CABINET; DESK; PRINTER; (2) CHAIRS; OFFICE #3: (1) SOFA TABLE; FILE CABINET; TELEVISION; MISC. | 400.00 |
| **REAR STAGE AREA:** | | |
| LOT | STAGE RIGGING | 100.00 |
| LOT | DOLLY; WHEELS | 100.00 |
| 1 | DELTA TABLE SAW | 200.00 |
| 1 | DEWALT CHOP SAW | 150.00 |
| 1 | BLACK & DECKER RADIAL ARM SAW | 75.00 |
| 1 | 3 3 H.P. RADIAL ARM SAW | 100.00 |
| 1 | FIVE DRAWER CABINET WITH LIGHTING GEARS & SUPPLIES | 150.00 |

# OSTRIN & OSTRIN Co.
## AUCTIONEERS
4101 BIRCH STREET, SUITE 150, NEWPORT BEACH, CA 92660
(949) 261-6169   FAX: (949) 261-5118

PASADENA PLAYHOUSE
INVENTORY, PAGE 9.

| QUANTITY | DESCRIPTION | LIQUIDATION VALUE |
|---|---|---|
| 12 | TRANJILAR ALUMINUM DOLLIES | $ 240.00 |
| 1 | ROCKWELL 18" VERTICAL BAND SAW | 400.00 |
| 2 | ELECTRIC CHAIN HOISTS | 200.00 |
| LOT | THREATRICAL PROPS (UPSTAIRS) | 1,500.00 |
| LOT | LADDERS | 40.00 |
| **STAGE:** | | |
| 1 | UPRIGHT LIFT TRUCK | 250.00 |
| LOT | MISC. SPOT LIGHTS | 100.00 |
| LOT | DRAPERY & COVERINGS | 100.00 |
| 1 | MORS MIXING BOARD WITH CASE (POSSIBLE 3RD PARTY) | 1,000.00 |
| LOT | HEAVY DUTY CABLE | 700.00 |
| LOT | ITEMS CONSISTING OF APPROX. (512) THEATRE SEATS (MAYBE LEASEHOLD ATTACHED TO PREMISES) | 250.00 |
| **LOBBY:** | | |
| 3 | RED UPHOLSTERED ARM CHAIRS | 120.00 |
| 1 | ANTIQUE STOOL WITH RECEPTION COUNTER | 100.00 |
| 1 | "POPCORN" CART | 50.00 |
| 3 | CARVED WALL CABINETS | 150.00 |
| 1 | EASEL | 5.00 |
| **THEATER LIGHTING BOOTH:** | | |
| 1 | EXPRESSION LIGHT CONTROL CONSOLE | 200.00 |

# OSTRIN & OSTRIN Co.
### AUCTIONEERS
4101 BIRCH STREET, SUITE 150, NEWPORT BEACH, CA 92660
(949) 261-6169   FAX: (949) 261-5118

PASADENA PLAYHOUSE
INVENTORY, PAGE 10.

| QUANTITY | DESCRIPTION | | LIQUIDATION VALUE |
|---|---|---|---|
| 1 | CHEST WITH CABINET | $ | 10.00 |
| **VIP KITCHEN & LIBRARY:** | | | |
| 1 | SCOTSMAN ICE MACHINE | | 200.00 |
| 2 | REFRIGERATORS | | 80.00 |
| 2 | "CYRANO" FRAMED PRINTS | | 200.00 |
| LOT | APPROX. 1,000 BOOKS | | |
| 2 | WALL MOUNTED "ACTOR" FIGURINES | | 50.00 |
| 1 | "INHERIT THE LAND" OIL PAINTING, 1958, MILDRED LARSON | | 300.00 |
| 1 | "COSTUME ROOM" OIL PAINTING, 1958 | | 300.00 |
| | TOTAL LIQUIDATION VALUE: | $ | 24,564.00 |

# OSTRIN & OSTRIN CO.

## AUCTIONEERS

4101 BIRCH STREET, SUITE 150, NEWPORT BEACH, CA 92660
(949) 261-6169    FAX: (949) 261-5118

PASADENA PLAYHOUSE
INVENTORY, PAGE 11.

### ITEMS CLAIMED TO BE PROPERTY OF 3RD PARTIES

### DESCRIPTION

| | |
|---|---|
| 1 | "LENORE SHANEWISE" OIL PAINTING PORTRAIT |
| 1 | "GILMORE BROWN" PORTRAIT |
| 1 | WINE BAR |
| 1 | 10 FT. X 12 FT. RED RUG (ON LOAN FROM CARPET/RUG DEALER) |
| 1 | 8 FT. X 10 FT. RED RUG (ON LOAN FROM CARPET/RUG DEALER) |
| 1 | VICTOR JORY BELL |
| LOT | THE ENTIRE CONTENTS OF THE LIBRARY, SPECIFICALLY INCLUDING ALL THE BOOKS; THE SUMID SCULPTURES; (2) 3 X 8 WALNUT TABLES; (8) S.B. CHAIRS WITH LEATHER BACKS. GILMOR BROWN'S DESK (RECEIPTS FOR (4) DOUBLE FACED PINE BOOKCASES (NOT LOCATED) |
| LOT | CONTENTS OF ARCHIVES UP TO 1988 (PER AGREEMENT SIGNED BY BRIAN COLBERN), WOODEN CARD VILES; METAL FILES CABINETS AND OTHER STORAGE CONTAINERS AND CABINETS ***APPRAISER DID NOT VIEW THESE ITEMS) |
| 1 | "GALLEON" FIRE CURTAIN |
| 1 | STEINWAY & SONS GRAND PIANO, S/N #177368 |
| 2 | 3 FT. X 5 FT. FRAMED MIRRORS (LOCATION UNKNOWN, PREVIOUSLY IN GREEN ROOM) |
| 1 | DINING TABLE AND CHAIRS IN GREEN ROOM |
| 1 | MEDITERRANEAN TABLE IN ANTE ROOM |
| 1 | ARCHIVES COMPUTER PURCHASED BY PPA&A 2/2005) *** APPRAISER DID NOT VIEW THIS ITEM |

**Exhibit C – Prepetition Financial Statements**

# Pasadena Playhouse State Theatre of Califc

## Balance Sheet

### As of May 10, 2010

3:36 PM

05/10/2010

Accrual Basis

|  | May 10, 10 |
|---|---|
| **ASSETS** | |
| **Current Assets** | |
| **Checking/Savings** | |
| 1015 · Wells Fargo Payroll | 9,240.33 |
| 1020 · Charles Schwab 1715 | 702.04 |
| 1024 · Wells Fargo Co Pro/Enhancement | 10,643.58 |
| 1025 · Community Bank Loan Reserve | 3,031.03 |
| 1027 · Wells Fargo NSC Funds | 73,974.97 |
| 1031 · Aletheia Securities-451037 | 4,247.12 |
| **Total Checking/Savings** | 101,839.07 |
| **Accounts Receivable** | |
| **1100 · Pledges Receivable** | |
| 1101 · Discount | -639,931.00 |
| 1102 · Annual Fund Pledges | 2,400.00 |
| 1103 · Next Stage Campaign Pledges | 5,868,568.28 |
| 1104 · Artistic Leadership Campaign | 66,515.00 |
| **Total 1100 · Pledges Receivable** | 5,297,552.28 |
| 1300 · Accounts Receivable | 385,384.27 |
| **Total Accounts Receivable** | 5,682,936.55 |
| **Other Current Assets** | |
| 1200 · Refundable Deposits | 2,515.00 |
| 1220 · Nabanco Credit Card Holdings | 72,036.71 |
| 1310 · Prepaid Expenses | 12,383.37 |
| 1380 · Prepaid Insurance | 20,216.21 |
| 1499 · Undeposited Funds | 37,498.30 |
| **Total Other Current Assets** | 144,649.59 |
| **Total Current Assets** | 5,929,425.21 |
| **Fixed Assets** | |
| **1700 · Theatre Equipment** | |
| 1701 · Cost Basis - Theatre Equipment | 694,150.32 |
| 1750 · Accum Depr - Theatre Equipment | -569,872.00 |
| **Total 1700 · Theatre Equipment** | 124,278.32 |
| **1705 · Furniture & Fixtures** | |
| 1706 · Cost Basis - Furn & Fix | 171,599.34 |
| 1755 · Accum Depr - Furn & Fix | -101,016.67 |
| **Total 1705 · Furniture & Fixtures** | 70,582.67 |
| **1710 · Leasehold Improvements** | |
| 1711 · Cost Basis - Leasehold Improv | 823,141.15 |
| 1760 · Accum Amort - Lease Imp | -494,598.74 |
| **Total 1710 · Leasehold Improvements** | 328,542.41 |

|  | May 10, 10 |
|---|---|
| **1715 · Computer Equipment** | |
| **1716 · Cost Basis - Computer Equipment** | 135,997.90 |
| **1765 · Accum Depr - Computer Equipment** | -124,487.31 |
| **Total 1715 · Computer Equipment** | 11,510.59 |
| | |
| **1720 · Non-depreciable Assets** | 1,450.00 |
| **1790 · Capital Projects in Progress** | 511,365.92 |
| **Total Fixed Assets** | 1,047,729.91 |
| | |
| **Other Assets** | |
| **1998 · Box Office Clearing Account** | -14,235.17 |
| **Total Other Assets** | -14,235.17 |
| | |
| **TOTAL ASSETS** | **6,962,919.95** |
| | |
| **LIABILITIES & EQUITY** | |
| **Liabilities** | |
| **Current Liabilities** | |
| **Accounts Payable** | |
| **2100 · Accounts Payable** | 422,308.17 |
| **Total Accounts Payable** | 422,308.17 |
| | |
| **Other Current Liabilities** | |
| **2215 · Sales Tax** | 826.91 |
| **2225 · Accruals** | |
| **2226 · Accrued Expenses** | 8,182.28 |
| **2230 · Deferred Payroll** | 47,884.54 |
| **Total 2225 · Accruals** | 56,066.82 |
| | |
| **2300 · Deferred Revenue** | |
| **2310 · Deferred Subs - Even Year** | 1,153,795.76 |
| **2329 · PASS Adjustments** | 29,793.25 |
| **2350 · Gift Certificates** | 11,744.75 |
| **Total 2300 · Deferred Revenue** | 1,195,333.76 |
| | |
| **Total Other Current Liabilities** | 1,252,227.49 |
| | |
| **Total Current Liabilities** | 1,674,535.66 |
| | |
| **Long Term Liabilities** | |
| **2500 · Loan Payable Old Community** | 179,307.49 |
| **2700 · Loan Payable - 2004 Community** | 392,867.85 |
| **2710 · Loan Payable-City Of Pas (CB)** | 49,017.42 |
| **2750 · American Express Chargebacks** | 22,462.30 |
| **Total Long Term Liabilities** | 643,655.06 |
| | |
| **Total Liabilities** | 2,318,190.72 |
| | |
| **Equity** | |

|  | May 10, 10 |
|---|---|
| **3000 · Opening Bal Equity** | -1,931,446.51 |
| **3900 · Retained Earnings** | 6,998,243.30 |
| **Net Income** | -422,067.56 |
| **Total Equity** | 4,644,729.23 |
| | |
| **TOTAL LIABILITIES & EQUITY** | **6,962,919.95** |

**B25B (Official Form 25B) (12/08) – Cont.**                                                                28

### Exhibit D – Most Recently Filed Postpetition Operating Report

(Not applicable - the May 2010 operating report is not yet due to be filed.)

**Exhibit E – Liquidation Analysis**

**Liquidation Analysis**[1]

### *Plan Proponent's Estimated Liquidation Value of Assets*

**Assets**

| | |
|---|---|
| a.   Cash on hand | $0[3] |
| b.   Accounts receivable | $0[4] |
| c.   Inventory, office furniture & equipment, machinery & equipment | $35,000 |
| d.   Automobiles | $0 |
| e.   Building & Land[2] | $0 |
| f.   Customer list | $5,000 |
| g.   Investment property  (such as stocks, bonds or other financial assets) | $0 |
| h.  Lawsuits or other claims against third-parties | $0 |
| i.   Other intangibles (such as avoiding powers actions) | $25,000[5] |
| | |
| ***Total Assets at Liquidation Value*** | **$65,000** |
| | |
| **Less:** Secured creditors' recoveries | $15,000 |
| **Less:** Chapter 7 trustee fees and expenses | $15,000 |
| **Less:** Chapter 11 administrative expenses | $40,000[6] |
| **Less:** Priority claims, excluding administrative expense claims | $1,200,000 |
| | |
| (1) Balance for unsecured claims | $0 |
| | |
| (2) Total dollar amount of unsecured claims | $1,100,000 |

| | |
|---|---|
| ***Percentage of Claims Which Unsecured Creditors Would Receive Or Retain in a Chapter 7 Liquidation:*** | **0%** |
| ***Percentage of Claims Which Unsecured Creditors Will Receive or Retain under the Plan:*** | **0%** |

---

[1] This liquidation analysis has been prepared assuming that the Debtor's current chapter 11 case converts to chapter 7 proceedings under the Bankruptcy Code on July 31, 2010.  All figures contained herein are best-estimate approximations.

[2] This includes leased real property of the Debtor and assumes that it will be rejected in a chapter 7 liquidation.

[3] This figure does not include approximately $90,000 in cash subject to "restricted-use" limitations.  In the event that the Debtor liquidates, these funds could not be used for the restricted purpose for which they were donated and would be unavailable to creditors.  Moreover, this figure does not include approximately $130,000 in cash from pledges contributed specifically to fund the Debtor's reorganization effort.  Pursuant to an order of the Court, in the event that the Debtor liquidates, these funds are to be returned pro rata to their respective donors.  *See Order Granting Emergency Motion for Order to Approve Use of Post-Petition Donations* [Docket No. 51].

[4] The Debtor's financial statement reflects positive accounts receivable, which consists entirely of unfulfilled pre-petition pledges.  Because such pledges are not legally enforceable, accounts receivable is reflected here as $0.

[5] Estimated potential royalty income from "Sister Act" and/other various performances.

[6] This figure includes the salary deferment of Sheldon Epps.  To support the Debtor's reorganization, Mr. Epps has agreed to defer a substantial portion of his salary during the bankruptcy period, payable upon emergence.  If the Debtor's reorganization fails and it liquidates, then Mr. Epps' deferred salary from the petition date to the conversion date will be accorded administrative priority.

**B25B (Official Form 25B) (12/08) – Cont.**                                    30

### Exhibit F – Cash on hand on the Effective Date of the Plan

**Cash on hand on Effective Date of the Plan**:                 $220,000[*]

*Less* B

    Amount of administrative expenses payable on Effective Date of     $15,000
the Plan

    Amount of statutory costs and charges                                 $5,000

    Amount of cure payments for executory contracts                      $85,000

    Other Plan Payments due on Effective Date of the Plan                 $0

        Balance after paying these amounts                     $115,000


The sources of the cash Debtor will have on hand by the Effective Date of the Plan are estimated as follows:

| | |
|---|---|
| $115,000 | Cash in Debtor's bank account now |
| + $95,000 | Additional cash Debtor will accumulate from net earnings between now and Effective Date of the Plan |
| + $0 | Borrowing |
| + $0 | Capital Contributions |
| + $0 | Other |
| $220,000 | Total |


* Approximately $90,000 of which is subject to "restricted use" limitations, including play development and renovation of the Playhouse theater. These funds would not be available in the event that the Debtor liquidates.

B25B (Official Form 25B) (12/08) – Cont.
31

**Exhibit G – Projections of Cash Flow and Earnings for Post-Confirmation Period**

**Suggested Final Business Plan & Budget**

| Carried from BK $112,000 | Aug-10 | Sep-10 | Oct-10 | Nov-10 | Dec-10 | Jan-11 | Feb-11 | Mar-11 |
|---|---|---|---|---|---|---|---|---|
| **EXPENSES** | | | | | | | | |
| Salary for Core Administrative Staff | 44,050 | 44,050 | 44,050 | 44,050 | 44,050 | 45,300 | 45,300 | 45,300 |
| Additional Administrative Staff | 2,250 | 2,250 | 2,250 | 2,250 | 2,250 | 2,250 | 4,000 | 4,000 |
| Development Staff  (Dir + 2) | 4,150 | 4,150 | 4,150 | 4,150 | 4,150 | 14,000 | 14,000 | 14,000 |
| Marketing Staff  (Dir +1) | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 9,600 | 9,600 | 9,600 |
| Production Manager | 0 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 |
| Maintenance Staff | 2,200 | 2,200 | 2,200 | 2,200 | 2,200 | 2,200 | 2,200 | 2,200 |
| Box Office / Front Office Staff | 0 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 |
| Employment Related Taxes @ 7.65% | 1,817 | 2,268 | 3,200 | 4,450 | 4,450 | 4,450 | 4,450 | 5,350 |
| Workers Compensation | 0 | 0 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 |
| Medical Insurance | 7,000 | 7,000 | 7,000 | 7,500 | 7,500 | 7,500 | 7,500 | 8,500 |
| Medical Insurance Offset | -2,300 | -2,300 | -2,300 | -2,300 | -2,300 | -2,300 | -2,300 | -2,300 |
| **Total Wages/Taxes/Benefits** | **66,667** | **83,368** | **90,300** | **92,050** | **92,050** | **105,250** | **107,000** | **108,900** |
| | | | | | | | | |
| Insurance (General/Auto/Umbrella/D&O) | 0 | 14,000 | 5,600 | 5,600 | 5,600 | 5,600 | 5,600 | 5,600 |
| Utilities | 7,000 | 7,000 | 9,400 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 |
| Telephone | 500 | 500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 |
| Playhouse Security | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 |
| Playhouse Parking | 300 | 300 | 1,800 | 1,800 | 1,800 | 1,800 | 300 | 300 |
| Equipment Leases and Maintenance | 500 | 500 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 |
| Office Supplies/Postage/Misc. Office Expenses | 1,000 | 1,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 |
| Tech Maintenance Services | 200 | 200 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 |
| Website | 1,500 | 1,500 | 500 | 1,500 | 500 | 500 | 1,500 | 500 |
| Electronic Ticketing Services | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 |
| Outside Storage | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 |
| Office Rent | 0 | 0 | 0 | 0 | 0 | 10,000 | 10,000 | 10,000 |
| Property Taxes | 0 | 0 | 0 | 0 | 0 | 17,000 | 0 | 0 |
| 2009 & 2010 Audit | 0 | 0 | 5,000 | 5,000 | 5,000 | 4,000 | 4,000 | 0 |
| Fundraising/Subscription Campaign Expenses (Devo & Mktg) | 0 | 0 | 3,000 | 2,000 | 2,000 | 0 | 0 | 6,650 |
| Carrie Hamilton Rent | 5,750 | 5,750 | 5,750 | 5,750 | 5,750 | 5,750 | 5,750 | 5,750 |
| **Total Overhead Expenses** | **18,050** | **31,050** | **41,850** | **42,450** | **41,450** | **65,450** | **47,950** | **49,600** |
| | | | | | | | | |
| Production Expenses | 0 | 0 | 0 | 175,000 | 0 | 25,000 | 25,000 | 75,000 |
| Actors Equity Bond | 0 | 0 | 0 | 30,000 | 0 | 0 | 0 | 0 |
| **Total Production Expenses** | **0** | **0** | **0** | **205,000** | **0** | **25,000** | **25,000** | **75,000** |
| | | | | | | | | |
| **EMERGENCE EXPENSES** | | | | | | | | |
| Epps, Sheldon-Salary Deferrment | 50,770 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Assumption of Sublease | 60,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Assumption of Lucas Horsfall Engagement for 2008 Audit | 16,100 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Utility Deposits | 5,845 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total Emergence Expenses** | **132,715** | **0** | **0** | **0** | **0** | **0** | **0** | **0** |
| | | | | | | | | |
| **INCOME** | **Total Expenses** | **217,432** | **114,418** | **132,150** | **339,500** | **133,500** | **195,700** | **179,950** | **233,500** |
| Royalty Income | 3,300 | 3,300 | 3,300 | 3,300 | 3,300 | 3,300 | 3,300 | 3,300 |
| Earned Production Income-Subscription | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 256,000 |
| Earned Production Income-Single Ticket | 0 | 0 | 0 | 44,500 | 44,500 | 44,500 | 44,500 | 0 |
| Concessions/Rentals/Miscellaneous Income | 9,000 | 9,000 | 0 | 0 | 3,000 | 3,000 | 3,000 | 3,000 |
| Donations | 500,000 | 500,000 | 400,000 | 60,000 | 300,000 | 40,000 | 40,000 | 65,000 |
| Endowment Investment Income *** | 0 | 0 | 0 | 0 | 0 | 12,500 | 12,500 | 12,500 |
| Gala (Net of Expenses) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total Income** | **512,300** | **512,300** | **403,300** | **107,800** | **350,800** | **103,300** | **103,300** | **339,800** |
| | | | | | | | | |
| **Unrestricted Cash fwd from BK period** | **111,990** | | | | | | | |
| **Net Income** | **406,858** | **397,882** | **271,150** | **-231,700** | **217,300** | **-92,400** | **-76,650** | **106,300** |
| **Accumulated Net Income** | **406,858** | **804,740** | **1,075,890** | **844,190** | **1,061,490** | **969,090** | **892,440** | **998,740** |

| Apr-11 | May-11 | Jun-11 | Jul-11 | Aug-11 | Sep-11 | Total |
|---|---|---|---|---|---|---|
| 45,300 | 45,300 | 45,300 | 47,000 | $47,000 | $47,000 | 633,050 |
| 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 45,500 |
| 14,000 | 14,000 | 14,000 | 14,000 | 14,000 | 14,000 | 146,750 |
| 9,600 | 9,600 | 9,600 | 9,600 | 9,600 | 9,600 | 123,900 |
| 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 81,250 |
| 2,200 | 2,200 | 2,200 | 2,200 | 2,200 | 2,200 | 30,800 |
| 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 130,000 |
| 5,500 | 5,500 | 5,500 | 5,600 | 5,600 | 5,600 | 63,735 |
| 6,000 | 6,000 | 6,000 | 0 | 0 | 0 | 60,000 |
| 8,500 | 8,500 | 8,500 | 8,500 | 8,500 | 8,500 | 110,500 |
| -2,300 | -2,300 | -2,300 | -2,300 | -2,300 | -2,300 | -32,200 |
| **109,050** | **109,050** | **109,050** | **110,850** | **104,850** | **104,850** | **1,393,285** |
|  |  |  |  |  |  |  |
| 5,600 | 5,600 | 5,600 | 5,600 | 5,600 | 0 | 70,000 |
| 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 133,400 |
| 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 19,000 |
| 600 | 600 | 600 | 600 |  |  | 7,200 |
| 1,800 | 1,800 | 1,800 | 1,800 |  |  | 15,600 |
| 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 25,000 |
| 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 62,000 |
| 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 12,400 |
| 500 | 1,500 | 500 | 500 | 500 | 500 | 10,500 |
| 500 | 500 | 500 | 500 | 500 | 500 | 7,000 |
| 200 | 200 | 200 | 200 | 200 | 200 | 2,800 |
| 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 90,000 |
| 0 | 17,000 | 0 | 0 | 0 | 0 | 34,000 |
| 0 | 0 | 0 | 0 | 0 | 0 | 23,000 |
| 6,650 | 6,650 | 0 | 0 | 0 | 0 | 26,950 |
| 5,750 | 5,750 | 5,750 | 5,750 | 5,750 | 5,750 | 80,500 |
| **51,100** | **69,100** | **44,450** | **44,450** | **35,950** | **36,450** | **619,350** |
|  |  |  |  |  |  |  |
| 0 | 300,000 | 0 | 0 | 300,000 | 0 | 900,000 |
| 0 | 0 | 0 | 0 | 0 | 0 | 30,000 |
| **0** | **300,000** | **0** | **0** | **300,000** | **0** | **930,000** |
|  |  |  |  |  |  |  |
| 0 | 0 | 0 | 0 | 0 | 0 | 50,770 |
| 0 | 0 | 0 | 0 | 0 | 0 | 60,000 |
| 0 | 0 | 0 | 0 | 0 | 0 | 16,100 |
| 0 | 0 | 0 | 0 | 0 | 0 | 5,845 |
| **0** | **0** | **0** | **0** | **0** | **0** | **132,715** |
|  |  |  |  |  |  |  |
| **160,150** | **478,150** | **153,500** | **155,300** | **440,800** | **141,300** | **3,075,350** |
|  |  |  |  |  |  |  |
| 3,300 | 3,300 | 3,300 | 3,300 | 3,300 | 3,300 | 46,200 |
| 0 | $0 | 0 | 0 | 0 | 0 | 256,000 |
| 0 | 0 | 50,000 | 50,000 | 50,000 | 50,000 | 378,000 |
| 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 48,000 |
| 40,000 | 40,000 | 40,000 | 40,000 | 0 | 0 | 2,065,000 |
| 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 112,500 |
| 275,000 | 0 | 0 | 0 | 0 | 0 | 275,000 |
| **333,800** | **58,800** | **108,800** | **108,800** | **68,800** | **68,800** | **3,180,700** |
|  |  |  |  |  |  |  |
| **173,650** | **-419,350** | **-44,700** | **-46,500** | **-372,000** | **-72,500** |  |
| **1,172,390** | **753,040** | **708,340** | **661,840** | **289,840** | **217,340** |  |

111,990.00 Unrestricted Cash
73,994.16 Restricted NSC
702.04 Restricted NSC
4,247.12 Restricted NSC
10,624.86 Restricted Grant
201,558.18 Net Cash